*1063
 
 OPINION
 

 Per Curiam:
 

 INTRODUCTION
 

 The Board of Medical Examiners (the Board) revoked the medical license of Dr. Gregory A. Minton (Minton) after a four-day administrative hearing. At the hearing, the Board considered evidence of numerous alleged instances of sexual misconduct by Minton with his dental patients. The Board heard the testimony of fifteen complaining witnesses, their friends and family members, two assistants from Minton’s office, seven medical experts, three character witnesses and Minton. The Board found numerous violations of the “Physicians and Assistants” chapter of the Nevada Revised Statutes and revoked Minton’s license. Minton then filed a petition for judicial review in the district court.
 

 In his petition, Minton asked the district court judge to supplement the record on review with evidence of media misconduct at the hearing, in order to support his claim of due process violations at the hearing. He also sought to supplement the record on review with prior, allegedly inconsistent statements of witnesses who had testified at the hearing. The judge denied Minton’s motion to supplement the record.
 

 In addition to seeking permission to supplement the record on review, Minton challenged the Board’s findings and conclusions and assigned error to the admission of expert testimony. He also claimed that the prosecutor failed to disclose exculpatory material. The district court judge denied Minton’s petition, letting stand the Board’s revocation of Minton’s license.
 

 
 *1064
 
 Minton appealed the district court judge’s denial of his petition to this court, claiming: (1) that the Board’s factual findings were erroneous and its conclusions unsupported by clear and convincing evidence; (2) that the judge abused his discretion in denying Minton’s motion to supplement the record; and (3) that Minton’s substantial rights were prejudiced when an expert, at the hearing, opined as to the veracity of three complaining witnesses and when the Board allowed affidavit testimony of one of the complaining witness’s husbands.
 

 We conclude that the Board had before it sufficient evidence at the hearing to support its findings and to warrant its conclusions. We therefore do not disturb the Board’s conclusions that Minton committed violations of the Physicians and Assistants chapter. We also conclude that the district court judge did not abuse his discretion in denying Minton’s motion to supplement the record. Finally, we conclude that the Board’s errors in admitting the expert opinion testimony on veracity and the affidavit testimony of a victim’s husband were harmless error. We therefore affirm the district court’s denial of Minton’s petition.
 

 STATEMENT OF FACTS
 

 On March 23, 1992, the Board filed a complaint against Minton, alleging violations of the Physicians and Assistants chapter of the Nevada Revised Statutes, which contains,
 
 inter alia,
 
 possible charges for inappropriate conduct by medical workers. The complaint alleged seven violations of NRS 630.304(5),
 
 [1]
 
 630.306(2)(a)
 
 [2]
 
 and 630.306(7)
 
 [3]
 
 with three former patients.
 

 The Board amended the complaint on April 14, 1992 to allege twenty-three additional violations under the same provisions with ten additional former patients, and to allege the violation of NRS
 
 *1065
 
 630.301(3).
 
 [4]
 
 The Board amended the complaint a third and fourth time, on June 9, 1992 and July 9, 1992, respectively, to allege eleven additional instances of misconduct under the same provisions with three more women, for a total of forty-one alleged violations against fifteen women. Many of the incidents were charged under two or more provisions.
 

 The Board conducted a four-day hearing from July 30, 1992 to and including August 2, 1992. The Board heard testimony from the fifteen former patients of Minton, eight of whom claimed that Minton had performed inappropriate pre-operative breast examinations. The remaining complaining witnesses claimed that Min-ton had engaged in a variety of other sexual actions, including placing the complainants’ hands on his penis and placing his penis in their mouths. Some of these complainants alleged that they had also received inappropriate breast examinations. Two former office assistants of Minton’s testified, as did Minton, seven expert medical witnesses and three character witnesses.
 

 Following is a summary of the testimony of the patients with whom the Board found that Minton had engaged in inappropriate sexual conduct, patients A, D, E, F, G, I, O and P. The Board did not find violations with patients B, C, J, K, L, M and N, the majority of complaining witnesses who had alleged that Minton had performed inappropriate breast examinations.
 
 [5]
 
 Charges regarding patient “H” were dropped at the beginning of the hearing due to the patient’s reluctance to testify.
 

 Patient “A” testified as follows: She was nineteen when she saw Minton for surgery for removal of her wisdom teeth in October 1990. Minton and the receptionist advised a late appointment. There was one nurse present when surgery began. Patient A remembered “waking up to the sound of voices, Dr. Minton
 
 *1066
 
 saying a thank you and a goodbye” to the nurse, who then left the room. She
 

 then remember[ed] waking up to his voice telling me to take deep breaths and feeling his hand placed under my shirt on to my left breast, skin to skin, not on my bra, but on the breast and realizing this was wrong, this wasn’t normal procedure.
 

 I tried to rationalize. It was his hand only. There was no stethoscope with him or underneath my shirt. It was his hand only. And I then I [sic] remember waking up again and feeling my right arm away from my body to the right placed out in this direction to where he was sitting on a stool. My hand was being moved in a backward and forward motion.
 

 She then stated that “my hand was placed on what I realized to be his penis and was being moved in a backward and forward motion on that. He had me fondling him with his hand on top of mine.” She explained that she knew it was not his fingers,
 

 [b]ecause I can tell between the skin on his hand and the skin that would be in the genital area of a lighter, softer, looser skin. There was no doubt in my mind. I realized where my hand was and immediately tried to pull it away several times, and my hand was placed back immediately to where it was before. I then remember him making a sudden movement and yelling something through the backdoor [sic], something in reference to being just a moment or just a minute. He then got up very hurriedly and got me out of the chair and in a very rushed fashion got me out of the doctor’s room.
 

 Patient A testified that she then joined her mother in the waiting room, and that she, the patient, was “very upset realizing what had happened. I was crying very hard. I was very scared and I didn’t know quite what to do. I could barely talk.” She told her mother about the incident on the way home, and her mother immediately called her uncle, a sergeant at the Douglas County Sheriff’s office. Patient A stated on cross-examination that she only felt, and did not see, these occurrences.
 

 Patient A’s mother testified as follows: After Minton’s receptionist had left the office, Minton suggested that the mother go to the pharmacy to have her daughter’s prescription filled. A’s mother testified that she
 

 told him I was concerned about getting the prescriptions. And he looked at his watch and he said, “Yes, I think you should go get them.” And he suggested K-Mart. So I left, and as I was driving to K-Mart, I started to get an uneasy feeling. I was thinking to myself, “I’ve left her there alone
 
 *1067
 
 with him.” And then another part of me was saying, “Well, that’s okay. He’s a doctor.”
 

 When she returned, the office personnel were gone and loud rock music was playing. She became concerned, but waited a few minutes before she leaned across the receptionist’s desk into the inner office (the procedures room) and yelled “Hello.” She heard Minton say that he would be out in a minute. She tried the doorknob on the door to the procedures room and it was locked. When her daughter came out of the procedures room she appeared frightened and was crying. The patient was pointing at Minton and back at herself to indicate something, and on the way home, she told her mother what had happened. She and her mother called police officers and went to the hospital for a physical examination.
 

 Patient “D” was twenty-six when she visited Minton for removal of her wisdom teeth, in June or July of 1990. She testified that she had a midafternoon appointment, around 2:30 to 3:00. Nothing eventful happened during the procedure, but she returned for a follow-up lunchtime appointment because of excessive swelling and infection from the surgery. Patient D testified that the whole staff left for lunch after Minton indicated he did not need any assistance with the procedure. She testified that she and Minton were alone, and that she was under general anesthesia. She then felt Minton place his hand under her blouse and fondle her breasts. When she woke up her blouse was unbuttoned. Minton then drove the patient home or back to work, where someone else drove her home.
 

 Patient D also testified that Minton called her to check into her condition after this follow-up. She was still swollen, and Minton told her that she could come in that day, a weekend day, and he would see her right away. D testified that the proposed appointment would have fallen on either Father’s Day or Mother’s Day and that she indicated that she could wait until the following Monday because she did not want to keep Minton from his family on a holiday. Minton said that he could see her immediately.
 

 D testified that at this third appointment Minton said that he would have to reopen the area, and that she was put under general anesthesia. During the procedure, she looked down and saw her breasts exposed, and her bra, which was a front closure bra, open. She felt Minton remove her blouse and saw him place his mouth on one breast, and a hand on the other. She said Minton told her that he had contacted her parents to tell them he had “run into some problems” and that he would drive her home.
 

 D testified that she went back after the first incident because she felt that “being a pharmacy tech ... I know the affects [sic]
 
 *1068
 
 of Valium and Demerol together can make an individual — it can make an individual hallucinate, basically or I don’t think imagine, but why would I think, having an oral procedure done, hallucinate on a sexual situation like this?” Cross-examination and questioning by the Board revealed confusion over the dates of the alleged third procedure, and Minton denied that it ever occurred. It was not recorded in the patient’s chart.
 

 D’s mother, a nurse, testified that D had immediately reported the first incident to her, but that the two women, both being in the medical field, thought that maybe the incident had not really happened.
 
 [6]
 
 D’s mother stated that she believed one of the procedures to have happened on a weekend, as both she and her husband were home watching D’s children.
 

 Patient “E” testified that she visited Minton on September 6, 1991 for removal of her wisdom teeth. She had a morning appointment. While she was under general anesthesia she felt someone fondle her breast, and touch her nipples. She felt Min-ton place her hand on his crotch. E’s husband had been sent to fill her prescription while she was undergoing surgery. Patient E described the incident in detail, and when she left the room and saw her husband, she became visibly upset. She was told by the office assistant that it was normal to be emotional when emerging from anesthesia. She then felt “a relief,” that maybe it “didn’t just happen. It was just the anesthesia.” She was visibly upset for several hours thereafter.
 

 Patient “F,” who was twenty at the time of the alleged incident, testified that she had a late afternoon appointment with Minton on November 30, 1989 for oral surgery. Minton had scheduled the surgery after informing her he had a 4:30 appointment slot open. She heard Minton say goodbye to his assistant, and tell his assistant that she could leave for the night. She specifically remembered this because she was afraid to be alone there, because her father-in-law had been taken to the Intensive Care Unit after receiving a “bad batch of Valium” in Minton’s office, and her father-in-law had been teasing her about this all week.
 

 Patient F testified that as she began to wake up, she felt a penis in her mouth. She stated that she felt
 

 
 *1069
 
 pressure on my chest. It was very difficult to breathe. I began to wake, open my eyes. It was dark. I felt something in my mouth at that time. I remember where I was. I knew why I was there. I started to wake up and I felt something in my mouth. My first thought was it was a rod. I realized it wasn’t an instrument. It was flesh, but it wasn’t his hand. As I woke up, I could swear it was a penis in my mouth.
 

 F’s head had been tilted to the right, and the chair was fully reclined. She then heard rustling and a zipper. She told her husband about this that same evening, but did not otherwise report it until she read in the newspaper about the other allegations.
 

 F’s husband testified that he accompanied her to the appointment, and that since his wife was afraid of needles he was present when Minton administered the I.V. He then left to fill his wife’s prescription, and when he returned the stalf was gone and Minton and his wife were alone in the procedures room, with the door locked. Minton emerged from the room after a few minutes and said to “give her a few minutes to wake up, and I’ll bring her right out.” Fifteen minutes later Minton brought her out of the procedures room.
 

 Patient “G” testified that on October 25, 1988 she went to Minton’s office with her boyfriend for surgery to remove wisdom teeth. Minton had suggested a late afternoon surgery. When she started to emerge from anesthesia, she felt Minton’s hand on her breast. Minton had told Patient G’s boyfriend that she had “really taken to the anesthesia, and [that she] was going to have to sleep it off.” G also testified that when she began “coming to, I felt his hand on my breast, and when my eyes — when I started to open my eyes, his hand moved from my breast to my chest, like he was shaking me.” She stated it was his right hand on her left breast. She also stated that “[w]hen I got into the car, my first question, I remember the whole thing going through my mind of what I felt and how I didn’t think that would be possible, because you put a certain amount of trust in a doctor, and you — it never occurs to you that will ever happen.”
 

 G told her boyfriend about the incident on the way home. She was living in San Francisco when her boyfriend called her and said, “You’re not going to believe this, everything that happened . . . It’s happened to other people. You shouldn’t be embarrassed .... Other people are coming forward.” She then reported the incident to the Board.
 

 Patient G’s boyfriend testified that Minton’s office staff left shortly after 5:00 p.m. and that Minton told him that G would be a while longer. Minton asked him to leave to fill her prescription and get a milk shake from a fast food restaurant. He returned and
 
 *1070
 
 G was still not ready to leave; she was finally ready to go between 7:30 and 8:00. When G and her boyfriend were in his car, she asked him if Minton had a ring on his finger, because she believed he was less likely to have done what she felt him do if he were married. The boyfriend wanted to return to confront Minton but stated that, “Quite honestly [G] wanted to forget about it as soon as possible.”
 

 Patient “I” saw Minton in February 1988 for surgery on her jaw. She went into Minton’s “back office, just this little office of his own .... And no nurse, no assistant, no anything, didn’t have you dress down in a gown, and proceeded to give the [breast] exam.” Minton told her that he needed to give a breast exam, and she
 

 told him I didn’t think it was necessary. And he said, “Yes, it is.” And I said, “I just had my yearly checkup in December and there’s nothing wrong with my breasts and I don’t think it’s necessary.” And he asked if I had any history of cancer in my family, and I told him, “Yes, my mother’s mother had died of breast cancer.” So then he told me it was all the more important that he give me a breast exam.
 

 She testified that “it went on forever. And the first [breast] was two minutes or more. And I said, ‘Don’t you think it’s enough?’ And he said, T feel something there. I want to make sure.’ Like he was feeling lumps.” She testified that the examination proceeded for seven to ten minutes. She testified that Minton was massaging and kneading her breasts, “feeling [her] up, I would say in a sexual way.”
 

 Patient I then drove to her parents’ home in Tahoe City. She testified that she cried all the way and told her parents that she did not want the surgery, that she did not trust or feel comfortable with Minton. Her parents told her she had “come this far,” and that she would not be alone with him in the surgery. They advised her to continue with the surgery, and her father took her to Carson City the next day.
 

 The surgery proceeded uneventfully, but Patient I had complications thereafter. She testified that she continued to visit Minton because she did not want to pay someone else another $6,000 to perform surgery “to correct something [Minton] didn’t, [sic] which is what I had to do anyway.” Because of the complications she had to return for a “forced duction”
 
 [7]
 
 procedure two weeks later. She asked both of her parents to attend. She arrived at the office at approximately 5:30 p.m. with both her parents.
 

 
 *1071
 
 Minton asked both of Patient I’s parents to leave to fill her prescription, and they indicated that they did not want to leave. When Minton pressed, I’s father indicated that he would fill the prescription while his wife stayed at the office. Minton then allegedly stated that if both of them were not going to go, then neither should.
 

 When Minton asked the parents to wait in the waiting room, the patient said the procedure would not occur unless one of her parents was present in the room. Minton asked if she did not trust him, and she answered that she did not. She felt that he was trying to get rid of her parents. On the way back to Tahoe, her parents told her that “it wasn’t in [her] head.” She cancelled a later appointment with Minton and never returned.
 

 Patient I had contacted the Medical Board in 1989 and had called lawyers, but had confined her inquiry to whether it was proper for an oral surgeon to conduct a breast exam. She was told by the Board that “[i]f you were going to be admitted into a hospital for some kind of surgery, usually breast exam is within a health and physical.” Her lawyers advised her at that time not to pursue charges against Minton.
 

 Patient I’s mother testified to the sequence of events involving she and her husband and to her daughter’s condition after the first breast exam. I’s father also testified and confirmed the details of his daughter’s and his wife’s testimony.
 

 Patient “O” saw Minton for dental work nearly a dozen times in 1985. She experienced an “uncomfortable” breast exam during one of these visits.
 
 [8]
 
 O returned to Minton in 1987, 1988 and 1989, when she also experienced uncomfortable breast exams. She testified that Minton assured her these were “normal procedure.” Patient O saw Minton several times between procedures. Each time she was not wary of being placed under general anesthesia because female assistants were present at the commencement of the procedures.
 

 On May 4, 1990 she received a forced duction procedure under general anesthesia. When she was awakening from the anesthesia she felt Minton leaning over her, kissing her on the lips, and
 
 *1072
 
 sticking his tongue in her mouth. He also placed his hand under her shirt and bra and fondled her breast. She testified that this occurred at the last procedure before she was going to move to Idaho, and she wanted to “let it go. I knew I’d be safe.” She told her friend, Kim, about this, but Kim did not believe her.
 

 Before she moved, patient O sent a card to the office staff and to Minton. In that letter, she wrote, “Special thanks to you, Dr. Minton, and your staff for all the trips to outer space and for all the staff putting up with me and the appointments I screwed up. I’ll really miss you all ... .”
 

 Patient O returned from Idaho to Carson City for a procedure with Minton in August 1990. Her husband drove her. She said that Minton had called her and asked her if she needed the procedure, and that she would not have to pay for it. O testified that, during this procedure and while under anesthesia, Minton was standing on her right side, he leaned over her, kissed her, placed his hand on her breast and fondled her breast. She stated that Minton was sitting facing her on the chair, with his penis exposed, and that he placed her hand on his penis to “have [her] masturbate him.” Minton then stood to her right-hand side, placed her hand on his penis, and placed his penis in her mouth. She said that Minton said this would stretch her jaw muscles. She then heard pounding on the door. She said that Minton did not ejaculate, because when he was buttoning his pants he was still erect. There was evidence that the patient did in fact pay for the procedure.
 

 Patient O’s husband did not testify. Instead, the Board allowed the prosecutor to introduce an affidavit, in which O’s husband stated that he drove his wife to her appointment. He also claimed that Minton told him to go get a prescription for his wife and to do some “sightseeing.” When he returned to the office there were no support staff members present and the door to the procedures room was closed and locked.
 

 Patient O did not tell her husband what had happened. However, her friend Kim, to whom she had disclosed the first incident immediately, called O in Idaho to tell her of the charges against Minton. O then became upset and told her husband.
 

 Patient “P” first met Minton in May 1986 after she was referred to Minton to correct an infection from a wisdom tooth removed by another doctor. P developed romantic feelings for Minton and became “emotionally involved” with him. She testified that he did not charge her for some procedures and “wrote off a lot of bills . . . And there were a lot of reasons why I knew things were different.”
 

 P was asked if Minton ever made any passes at her, and she responded, “Yes. . . . Which incident?” She said that Minton
 
 *1073
 
 told her he was going to Texas with his wife, but that “he was going to be baching it for a while, [while] his wife [remained in] Texas,” and that he would like to call her for a drink when he returned from Texas. He called her, but she was negotiating a marriage settlement with her former husband, and she could not talk at that time. He never called to ask her out again.
 

 Minton asked patient P to be his last appointment for a procedure in August 1991, and he asked her to have a friend, rather than her former husband, bring her. P testified that Gretchen Gattis, an office assistant, was there when Minton put P under anesthesia. She then testified that “when I woke up, there was no one in the room, the chair was back in a totally reclining position. He had his right hand on my head. His left hand was on his penis and his penis was in my mouth.” She stated that she saw his penis, and felt a backward and forward movement. She said she “was very confused. I wasn’t confused about what he’d done, but I was confused about the way he went about doing it.” She remembered asking him why he knocked her out to do this, and she remembered him kissing her at that point and reaching toward the I.V. with his hand. She then went under again.
 

 P said that she “was not conscious [of] when he ejaculated in my mouth, but there is absolutely no doubt in my mind that he did. When I woke up, the taste of semen was so strong in my mouth, the first thing that I did was reached up and I felt like my face, surely it had to be wet. It wasn’t.” She testified also that she did not feel she “had been offended. I was very confused. I had just gotten separated ... I was an emotional wreck.”
 

 Patient P testified that her friend was in the room when she awoke, so she did not confront Minton. She told her friend what had happened in the car. She stated also that “as time went on, it just became more difficult and I thought maybe he thought that I did not have any conscious memory . . . and it was easier for me to deal with it by just trying to forget about it.”
 

 Patient P saw Minton again in November 1991. She had decided that she was not going to see Minton after that because she was “becoming emotionally involved with him.” She went for a forced duction procedure at 4:30, and she heard Minton tell his office attendant that she could leave after the procedure. Minton then told her about his wife’s trip to Texas, and he kissed her, whereupon she said, “‘Oh, that was really nice. You’re giving me a Christmas kiss.’ And then he gave me a kiss again. It was a passionate kiss, and I kissed him back, but I still hadn’t talked to him yet. . . .” P’s friend had gone to use the phone, at which time P told Minton that she would not be able to see him again because of her feelings; Minton then kissed P and she kissed him back. Minton stopped kissing P when her friend appeared.
 

 
 *1074
 
 Patient P also testified that Minton called her on her cellular phone, after some of the incidents had been reported, and that Minton asked her to “write a testimonial” for him. She asked what he wanted her to write, and stated that she “would have done anything for him.” He asked her to write about a preoperative breast exam, which she had never received. He wanted her to state that he had given her the examination. She did not remember such an exam, and asked him what he wanted her to write.
 

 Although she considered writing the testimonial, she never wrote it. However, she did write Minton an intimate personal letter describing her feelings for him. She wrote the letter in April 1992. P testified that her intentions in writing the letter were to get together with Minton; she wanted to discuss what had happened and she was expressing her feelings for him. In January 1992 she had confided in a doctor friend and described the fellatio incident. Although he advised her to come forward, she began therapy and tried to forget the incident.
 

 Michael R. Mandel, M.D., a psychiatrist with extensive expertise in psychopharmacology, testified regarding the hallucinogenic effects of certain drugs, including Valium, Demerol and Brevital, the anesthetics used by Minton. He testified that, “A hallucination is a perception, primarily visual, sometimes auditory, and there are other types . . . including olfactory ... or tactile or feeling hallucinations.” He testified that tactile hallucinations are exceedingly rare, if they occur at all, outside schizophrenia and cocaine addiction. He further testified that a combination of sensory hallucinations, such as a patient experiencing a tactile, auditory and visual hallucinations at once, is extraordinarily rare.
 

 Mandel also testified that he conducted an extensive search to discover literature on the hallucinatory effects of the drugs used by Minton, looking particularly for articles on the frequency or incidence of sexual hallucinations. He found research by only one author, J. W. Dundee, Ph.D., M.D. Mandel noted that Dundee’s writings were based only on case studies, and not “controlled, careful research.” Richard Bjur, Ph.D., professor of pharmacology at the University of Nevada — Reno School of Medicine, concurred in Mandel’s assessment of the quality and reliability of Dundee’s “study.”
 
 [9]
 
 Mandel stated that it was his medical opinion
 
 *1075
 
 that the drugs used by Minton do not “give any credence to any defense that the allegations . . . were really sexual hallucinations.”
 

 Mandel was also allowed to offer his opinion regarding three of the complainants, Patients “D,” “O” and “P.” He stated that psychological evaluations that he conducted on all three complainants indicated that they were credible. He also stated that “Brevital blues,” a condition in which a patient may be depressed or emotional after undergoing anesthesia with Brevital, typically lasts one hour and that he would be surprised if it lasted six to twelve hours.
 

 Gerald Hanson, D.D.S., a Las Vegas oral surgeon, testified from his personal knowledge and experience regarding his method of conducting pre-operative breast examinations, and regarding the 6400 patients to whom he has administered the same type of drugs as Minton administered. He stated that none of his patients reported hallucinations, including sexual hallucinations.
 

 Minton called three medical experts, all oral surgeons, who testified that breast exams are part of a normal pre-operative physical and history. They then testified regarding their methods of conducting pre-operative breast examinations, and regarding the effects of the same drugs on their patients as Minton had administered on his. The Board found that none of the doctors had described situations in which patients had reported sexual hallucinations, except one doctor’s wife who had become “amorous” after the administration of nitrous oxide, a drug unrelated to the three used by Minton.
 

 Minton also called Carson City doctors who testified that of the hundreds of patients they have referred over the years, no patient has ever complained about Minton’s conduct. Minton also called a former employee who testified that she had never heard complaints about the breast exams.
 

 Finally, Minton testified that he performed breast examinations as part of a routine pre-operative practice. Minton testified that he would have the woman raise her right arm, and that he would examine each quadrant of each breast. He then described a very detailed procedure that was inconsistent with each of the eight complainants who had described what they felt was an inappropriate breast examination. He performed these examinations in his private office, as it was the only private area in the office area.
 
 *1076
 
 He did not testify that there was always a female attendant present during the examination, but he did testify that he had never heard a complaint.
 
 [10]
 

 Minton also testified that to recuperate a patient he will “squeeze the trapezius muscle, talk to them, give them verbal commands, take a deep breath, put my hand on their chest, tap their chest or push on their chest to try to see if that stimulates them to take a deep breath, as well.” Minton also testified that he was responsible for removing the I.V. and bringing the patient around, and that he would allow the assistants to leave at 5:00 while he waited to do this. He testified that during the day the door was not usually locked, but that when he was alone he would lock the door because he did not want the patient’s “ride or whatnot becoming syncopal and having a problem.” He also stated he did not want two patients on his hands (should the “ride” walk in and become ill at seeing his friend or relative after a procedure).
 

 Minton also testified that he would send his patients’ rides to the pharmacy because he was concerned that a late-day patient would not be able to fill a prescription before the pharmacy closed, and because he was concerned that a groggy patient might be left alone in the car when the ride stopped to fill the prescription on the way home.
 

 Minton also testified that although he kissed patient P on the cheek after she kissed him, that Patients F, O and P were lying about their fellatio accounts. He stated that all of the complainants who complained of inappropriate breast exams were not telling the truth about those incidents. He also stated that he felt the women stood to gain financially and from the publicity. In addition, he posited psychiatric problems as a reason for the reports.
 

 The Board found violations of the statutory provisions involv
 
 *1077
 
 ing the seven women who complained of sexual activity other than breast examinations, and involving one of the women who complained of an inappropriate breast examination, and revoked Minton’s medical license in a decision rendered August 26, 1992. Regarding the other seven women, the Board did not find by clear and convincing evidence that the breast examinations complained of were outside an acceptable standard of care.
 

 Specifically, the Board found all of the witnesses credible and without motive to fabricate their testimony. The Board also found the following circumstances (present in most instances) to be circumstances corroborating the testimony of the witnesses: (1) nearly every complaining witness was a female whose appointment had been scheduled late in the afternoon, when such procedure would require the patient to remain in the office past closing; (2) nearly every patient was left alone with Minton when office personnel left for the day before each patient’s appointment was complete; (3) Minton, in each instance, asked the patient’s “ride” to leave the office and to go to the pharmacy to fill the patient’s prescription so that the patient would have medication on leaving the doctor’s office; (4) the door to the office and/or to the operating room was locked when the “ride” returned.
 

 Minton filed a petition for judicial review in the district court, claiming that his rights to due process were violated in the administrative hearing and asserting numerous other errors. Particularly, Minton claimed in the petition that: (1) he was forced to bear the burden of proof to disprove the allegations and establish his innocence; (2) the proceedings were unfairly influenced by the news media and the Board failed to maintain order, protect witnesses from outside influence and provide a forum consistent with due process; (3) the “guilty” determinations were not based on clear and convincing evidence; (4) in making the “guilty” determinations, the Board made inconsistent, clearly erroneous and arbitrary and capricious findings and conclusions; and (5) that the Board erred in allowing an expert witness to vouch for the credibility of three complainants. In his opening brief to the district court, Minton also alleged that his constitutional right to confront the witnesses against him had been violated, and that he was deprived of the ability to defend against “stale claims.”
 

 In addition, Minton moved the court to supplement the record on judicial review. Minton asked the court to consider affidavits regarding the conduct of the media at the hearing, and to consider statements of complainants and possible witnesses that were allegedly exculpatory and not disclosed to the Board. The court denied Minton’s motion to supplement the record, and after considering the briefs, the record and oral argument, denied Minton’s petition for review. Minton appealed to this court,
 
 *1078
 
 asserting several of the same arguments, claiming specifically: (1) that the Board’s findings of fact were clearly erroneous and that its conclusions were not supported by clear and convincing evidence; (2) that the district court judge abused his discretion in denying Minton’s motion to supplement the record on review to explore Minton’s claim of a due process violation; (3) that the district court judge abused his discretion in denying Minton’s motion to supplement the record on review to allow the consideration of allegedly inconsistent and exculpatory prior statements of witnesses in the possession of the prosecutor and Board investigators; and (4) that Minton’s substantial rights were prejudiced when an expert, at the hearing, opined as to the veracity of three complaining witnesses and when the Board allowed affidavit testimony of one of the husbands of a complaining witness.
 

 I. WHETHER THE BOARD’S FINDINGS OF FACT WERE CLEARLY ERRONEOUS AND ITS CONCLUSIONS OF LAW UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE.
 

 Minton claims that the Board’s factual findings are clearly erroneous and its conclusions that he violated the Physicians and Assistants chapter unsupported by clear and convincing evidence. We disagree.
 

 NRS 233B.135(3)(e) provides that a reviewing court may set aside in whole or in part a final decision of an administrative agency if the final decision is clearly erroneous in view of the reliable, probative and
 
 substantial
 
 evidence on the whole record. (Emphasis added.) This statute articulates the substantial evidence standard of review for assessing factual findings and agency decisions. We have defined substantial evidence as “that [evidence] which a reasonable mind might accept as adequate to support a conclusion.” State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986).
 

 In the instant case, however, a more specific statute provides the particular standard of review for assessing factual findings. In medical license revocation proceedings, “clear and convincing evidence” is required before a license may be revoked. NRS 630.352(1). We construe this statute to supersede the portion of the administrative procedure act subjecting factual findings to the “clearly erroneous in view of the reliable, probative and substantial evidence” standard. Instead, the applicable statute requires that the Board’s factual findings, and the conclusions which are based thereon, be supported by clear and convincing evidence.
 

 
 *1079
 
 In addition, in a professional discipline case such as this one, where the burden on the prosecuting authority is to establish violations by clear and convincing evidence, this court will not engage in independent — or
 
 de
 
 novo — review.
 
 See
 
 Goldman v. Nevada Comm’n on Judicial Discipline, 108 Nev. 251, 267, 830 P.2d 107, 117-18 (1992);
 
 see also
 
 Whitehead v. Comm’n on Judicial Discipline, 110 Nev. 874, 878 P.2d 913 (1994) (Shearing, J. dissenting)
 
 (Whitehead III).
 

 [11]
 

 This court will instead review the record and decision with a degree of deference, seeking only to determine whether the evidence adduced at the hearing was sufficient to have convinced the deciding body that violations had been shown by clear and convincing evidence.
 
 See id.
 
 Moreover, this court is prohibited from substituting its judgment for that of the Board as to the weight of evidence on a question of fact. NRS 233B. 135(3). Finally, it is the province of the Board to make credibility determinations and this court is not permitted to pass on the credibility of witnesses or to weigh their testimony.
 
 See, e.g., id.;
 
 State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608 n.1, 729 P.2d 497, 498 n.1 (1986); Local Gov’t Emp. v. General Sales, 98 Nev. 94, 98, 641 P.2d 478, 480-81 (1982).
 

 The testimony adduced at the hearing and recounted above was significant and was sufficient to constitute clear and convincing evidence for the Board’s factual findings and for its conclusions based thereon that violations of the chapter had been established. The witnesses reported in detail their observations and the Board members themselves questioned the complaining witnesses extensively after the prosecutor and Minton’s attorney had had an opportunity to examine them. The Board specifically found each of the complaining witnesses credible and without motive to fabricate testimony. The Board also heard considerable testimony from friends and relatives of the complaining witnesses who all provided some degree of corroboration regarding the details surrounding the visits and the complaints. We conclude that the Board had before it clear and convincing evidence of the violations that it found.
 

 
 *1080
 
 In addition to claiming that the testimony of the complaining witnesses did not constitute clear and convincing evidence of violations, Minton claims that the Board’s findings and conclusions with regard to Patient “I” were arbitrary and capricious. He claims that it was arbitrary and capricious for the Board to have found a violation with this patient who complained of an inappropriate breast examination but to have “acquitted” Minton on the other complaints of improper breast examinations. We conclude, after reviewing the record, that Patient I’s testimony described a scenario different in quality and scope from the other breast exam complainants such that the Board’s conclusion that a violation had occurred is neither arbitrary nor capricious.
 

 The Board’s findings and conclusions, based on the testimony adduced at the hearing, are supported by clear and convincing evidence in the record and are not arbitrary and capricious. Accordingly, we defer to the professional board whose members were in the best position to judge the credibility of all witnesses and to examine the witnesses in light of their professional knowledge and experience. We therefore uphold the Board’s decision on this basis and reject Minton’s challenge.
 

 II. WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING MINTON’S MOTION TO SUPPLEMENT THE RECORD ON REVIEW TO EXPLORE MINTON’S CLAIM OF DUE PROCESS VIOLATIONS.
 

 Minton claims that his hearing was conducted in a manner that deprived him of his constitutional due process guarantees. He claims that the “circus atmosphere” at the hearing was “reminiscent of the Salem Witch Hunt,” and that the conduct of the media requires reversal in this case. Minton asked the district court judge to supplement the record on review with several sworn letters and affidavits.
 
 [12]
 
 In the letters, the authors describe being overcrowded into a small hearing room, with media personnel interrupting the proceedings, exiting and entering in a noisy manner, setting up equipment on the respondent’s (Minton’s) table, placing microphones within inches of the witnesses’ faces
 
 *1081
 
 and generally being given “free reign” over the hearing room. Minton did not object at any time during the proceedings to the alleged misconduct of the media. The district court judge denied Minton’s motion to supplement the record.
 

 A court reviewing an agency decision is authorized to supplement the record and to receive evidence “[i]n cases concerning alleged irregularities in procedure before [the] agency that are not shown in the record.” NRS 233B.135(l)(b).
 
 [13]
 
 Any evidence must pertain only to the alleged irregularities.
 
 Id.
 
 Thus, the court was authorized to accept the information, in the form of sworn letters or affidavits, if it determined that the proffered information was relevant to a procedural irregularity.
 

 The relevant statute provides, however, that the court “may” receive evidence. NRS 233B.135(l)(b). The decision to accept supplemental information is therefore within the discretion of the district court.
 
 [14]
 
 This court will not reverse matters within the discretion of a district court judge absent a showing of abuse of discretion.
 
 Cf.
 
 NRS 233B.135(3)(f) (stating abuse of discretion as a basis for reversing decision); Young v. Johnny Ribiero Building, 106 Nev. 88, 92, 787 P.2d 777, 779 (1990) (discovery sanctions); Schouweiler v. Yancey Co., 101 Nev. 827, 831, 712 P.2d 786, 789 (1985) (district court’s denial of excess expert witness fees).
 

 In the instant case, the district court judge concluded that the conduct described in the letters did not rise to the level of a violation of Minton’s due process guarantees. Unless the complained-of conduct establishes that due process violations occurred, the judge acted within his discretion in denying Min-ton’s motion. Accordingly, we consider whether a proceeding without media safeguards or other affirmative action by the tribunal violates due process, and whether the district court judge’s ruling was therefore an abuse of discretion.
 
 [15]
 

 
 *1082
 
 Generally, the right to practice medicine is a property right protected by the due process clauses of the United States and Nevada Constitutions, and a license to practice medicine may not be arbitrarily abridged or revoked.
 
 See
 
 Molnar v. State, Bd. of Med. Examiners, 105 Nev. 213, 216, 773 P.2d 726, 727 (1989); Potter v. State, Bd. of Med. Exam’rs, 101 Nev. 369, 371, 705 P.2d 132, 134 (1985). As a result, due process protections apply in administrative hearings to revoke a medical license.
 
 See Molnar
 
 105 Nev. at 216, 773 P.2d at 727-28 (due process requires Board to base decision on conclusions of hearing officer who heard testimony);
 
 Potter,
 
 101 Nev. at 371, 705 P.2d at 134 (voting process violated due process);
 
 Cf.
 
 Bivins Constr. v. State Contractors’ Bd., 107 Nev. 281, 283, 809 P.2d 1268, 1270 (1991) (cross examination in administrative hearing may not be curtailed).
 

 However, the legal process due in an administrative forum “is flexible and calls for such procedural protections as the particular situation demands.” Burleigh v. State Bar of Nevada, 98 Nev. 140, 145, 643 P.2d 1201, 1204 (1982). To determine whether a given procedure appropriately safeguards an individual’s due process guarantees, a reviewing court must weigh: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that private interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. State, Dep’t Mtr. Vehicles v. Vezeris, 102 Nev. 232, 236, 720 P.2d 1208, 1211-12 (citing Matthews v. Eldridge, 424 U.S. 319, 335 (1976);
 
 Burleigh,
 
 98 Nev. at 145, 643 P.2d at 1204 (citing
 
 Matthews).
 

 The right to continued possession of one’s medical license implicates a significant private interest, as the ability to practice medicine affects the livelihood of the individual holding the license.
 
 See Molnar,
 
 105 Nev. at 216, 773 P.2d at 727 (citing
 
 *1083
 

 Potter,
 
 101 Nev. at 369, 705 P.2d at 134). Accordingly, the first factor weighs heavily in Minton’s favor.
 

 Under the second prong of the due process test, however, the absence of safeguards must suggest a risk of erroneous deprivation. Minton has not produced evidence nor suggested a theory as to how a Board composed of professionals was or could have been prejudicially influenced by the conduct of the media alleged to have occurred at his hearing. Nor has Minton shown how media restrictions, formal or informal, or other action taken by the Board, would have tended to have reduced the risk of an erroneous deprivation of his license.
 

 This was not a jury trial, in which courts have found that due process requires significant restriction of media intrusion.
 
 See, e.g.,
 
 Estes v. Texas, 381 U.S. 532, 540, 561 (1965); Callahan v. Lash, 381 F. Supp. 827 (N.D. Ind. 1974);
 
 see also
 
 SCR 229-247 (outlining in detail the procedures to be followed and limitations placed upon media conduct regarding “any . . . matter held in open court which the public is entitled to attend”).
 
 [16]
 

 The hearing was, rather, a proceeding conducted by medical professionals who questioned the complaining witnesses and other witnesses (including Minton) extensively based upon their medical experience and knowledge. The Board was not an impressionable panel of laypersons. In addition, not one statement by a witness or board member and not one break in testimony or other indication supports the inference that the Board was subjected to interruption of testimony or other conduct that would indicate the Board gave less than its full attention to the testimony before it. Accordingly, the risk of erroneous deprivation appears to be absent from the equation.
 

 The Board, of course, has a continuing duty to rule appropriately on proper objections interposed by the defendant. It does not appear, however, that any procedure or set of guidelines would alter the minimal risk of an erroneous deprivation of a medical license because of the media’s conduct or misconduct.
 

 In addition, detailed media guidelines, such as those which have been drafted to govern criminal trials and appeals, and which impose on the panel obligations beyond the general duty to conduct a proceeding free of interruptions and to rule appropriately on proper objections to alleged misconduct, would entail a fiscal and administrative burden on the agency. Although the burden would not be extreme, the burden is a factor to consider in the balancing test required by
 
 Burleigh
 
 and
 
 Vezeris.
 

 
 *1084
 
 After balancing the above factors, we conclude that the absence of media guidelines in itself does not rise to the level of a violation of due process guarantees. In addition, no indication in the record demonstrates the type of situation that would have required Board members to affirmatively police the media in the absence of an objection, and there is no way of knowing whether the Board would have ruled appropriately on proper objections because none were made. The district court judge therefore did not abuse his discretion in denying Minton’s motion to supplement the record on review with the affidavit testimony and did not err in denying Minton’s petition on his due process claim.
 

 III. WHETHER THE DISTRICT COURT JUDGE ABUSED HIS DISCRETION IN DENYING MINTON’S MOTION TO SUPPLEMENT THE RECORD ON REVIEW WITH EVIDENCE OF ALLEGEDLY INCONSISTENT AND EXCULPATORY WITNESS STATEMENTS IN THE POSSESSION OF THE PROSECUTOR AND BOARD INVESTIGATORS.
 

 Minton also claims that the district court judge abused his discretion in failing to supplement the record with additional evidence of deposition testimony and allegedly inconsistent prior statements of witnesses that were in the possession of Board investigators and the prosecutor. He claims that although discovery is not required in administrative hearings, due process' requires the production of exculpatory material in the possession of the charging authority.
 

 A review of the proffered statements and testimony, however, reveals that the statements were not “exculpatory” or inconsistent. Although there may be instances in which failure to produce exculpatory material may rise to the level of a due process violation, that did not occur here. There was no reason for the prosecutor or Board investigators to have considered the statements it had collected as exculpatory.
 

 Minton claims that a prior statement of Patient E proved that she was not alone with Minton. However, in her testimony, this patient never claimed she was alone in the office during the entire procedure with Minton, only that at some point in time she felt her breasts being fondled and felt her hand placed on Minton’s crotch. The allegedly inconsistent and exculpatory prior account contains a statement that she “heard Dr. Minton say, T think she’s coming out of it,’ as an assistant was coming into the room.” Thus, the prior account indicates her belief that she
 
 was
 
 alone with Minton until the assistant entered the room. As this
 
 *1085
 
 was the only portion of this prior statement claimed to be exculpatory, we conclude that the judge did not abuse his discretion in refusing to supplement the record with the statement.
 

 Minton also claims that a statement given by his assistant Gretchen Gattis, at the Carson City Sheriff’s Department, was an exculpatory prior statement that the prosecutor was required to disclose. Again, however, a reading of the statement indicates that it is not inconsistent with the witness’s testimony at the hearing. Minton claims that the statement is inconsistent with the witness’s hearing testimony because it refutes that Minton had a “pattern” of scheduling young women for late afternoon procedures. However, Gattis confirms in her statement that most of Minton’s late afternoon patients were women, although she admits that Minton’s practice as a whole was largely female. This fact was brought out repeatedly at trial. The judge did not abuse his discretion in failing to supplement the record on review to consider this statement.
 

 Finally, Minton sought to supplement the record on review with the testimony of two former assistants, Nicole Gager and Adrienne Flanders. He did not allege that the information he sought to introduce was in the possession of prosecutors; rather, he alleged that the “new information” was evidence that tended to refute or contradict important witness testimony that had been admitted at the revocation hearing.
 

 The “new information” was the testimony of Gager and Flanders, testimony that had been given at the preliminary hearing held to determine whether to bind Minton over on criminal charges. It also included three letters written by Gager over a six-month period, the content of which formed the bulk of her preliminary hearing testimony.
 

 There is nothing exculpatory about the letters and testimony, however. In fact, the testimony revealed that both women, along with other office assistants, considered Minton’s late afternoon behavior suspicious. Their preliminary hearing testimony revealed that some of the employees had waited together outside in a car after one of the late afternoon procedures to observe Minton and to determine if anything strange was occurring. Finally, the letters and testimony confirm that Minton scheduled, or that the assistants scheduled, late appointments and that the assistants would leave when they were finished with their work, and that Minton would sometimes lock the door to the procedures room after they left. Based on the above, it is evident that the district court judge did not abuse his discretion in failing to supplement the record on review with this information.
 

 
 *1086
 
 IV. WHETHER MINTON’S SUBSTANTIAL RIGHTS WERE PREJUDICED WHEN AN EXPERT, AT THE HEARING, OPINED AS TO THE VERACITY OF THREE COMPLAINING WITNESSES AND WHEN THE BOARD ALLOWED AFFIDAVIT TESTIMONY OF ONE OF THE HUSBANDS OF A COMPLAINING WITNESS.
 

 Minton claims that the Board committed prejudicial error when it allowed Dr. Mandel to offer his opinion as to the veracity of three of the complainants, Patients “D,” “O” and “P.” Mandel was allowed to state:
 

 It’s my opinion that they are not the types of people who would distort. They are, in fact, I think the opposite. They tended to be a bit reluctant at first in coming forward. They didn’t have any axe to grind, in my opinion. They didn’t have any particular gain. They were most credible.
 

 In criminal trials, an expert witness may not offer an opinion regarding the veracity of a witness, as this invades the province of the fact-finder. Lickey v. State, 108 Nev. 191, 196, 827 P.2d 824, 827 (1992); Townsend v. State, 103 Nev. 113, 119, 734 P.2d 705, 708 (1987). However, the Board is not bound by formal rules of evidence. NRS 630.344(1).
 

 Although admission of Mandel’s testimony would certainly have been error in a criminal trial, it was not necessarily error at the Board’s hearing because the Board is not bound by formal, statutory rules of evidence. There may well be instances in which an agency disregards the concepts behind the rules of evidence to such an extent that due process violations may occur, but that did not occur in the instant case with this isolated alleged error.
 

 In addition, this type of error is subject to harmless error analysis in a criminal case.
 
 Townsend,
 
 103 Nev. at 119, 734 P.2d at 708. Furthermore, also in a criminal case, failure to object to inadmissible evidence precludes the right to assign error on appeal. Henderson v. State, 95 Nev. 324, 326, 594 P.2d 712, 713 (1979). In the instant case, Minton never objected to the proffered testimony, and he would be precluded from assigning error on appeal in a criminal case. We conclude that he is also precluded from assigning error to the Board on review in the instant case. [Headnote 19]
 

 In any event, assuming that admission of the statement was error, it was harmless in view of the entire record and the
 
 *1087
 
 testimony of, and attempted impeachment of, all three witnesses. The trier of fact was a board of professionals, not a jury likely to be influenced by the testimony of an expert regarding a witness’s veracity or credibility. The Board members and Minton extensively questioned the complaining witnesses and the Board was in a position to judge their veracity and credibility without the benefit of Mandel’s expert testimony.
 

 In addition, Minton placed mental health in issue, and Mandel testified that when he conducted psychological examinations of the three women, he found them credible and he found them to be mentally healthy, but in need of counselling for “adjustment disorders.” He did not testify that their hearing testimony was credible, only that he found them to be credible in forming his professional opinion and diagnosis. This may well have been relevant to rebut Minton’s assertion that the allegations were fabrications stemming from mental disorders and were therefore not worthy of belief.
 

 For all the reasons above, we conclude that the Board, if it erred in admitting Mandel’s statement at all, did not commit prejudicial error requiring reversal of its decision.
 

 Finally, Minton claims that the Board committed reversible error in admitting a statement made by the husband of Patient O, which was introduced and admitted only as a sworn statement. O’s husband did not testify at the hearing. Minton claims that O’s credibility was key, and that her husband’s affidavit unfairly bolstered her credibility. Minton argues that had the husband been present, he would have cross-examined the husband, not regarding his own statement, but regarding the husband’s beliefs as to why O had not reported the incident earlier, and other matters regarding O’s motives and credibility.
 

 First, although the affidavit would probably have been inadmissible hearsay in a court trial, the Board is not bound by formal rules of evidence.
 
 See
 
 NRS 630.344(1). Second, O was present and could have been questioned regarding her own statements and motives. For these reasons, it is not clear that the Board erred in admitting the affidavit, although it would have been preferable to have had the husband testify orally.
 

 Moreover, even if introducing the affidavit were error, it was harmless. Constitutional Confrontation Clause violations are subject to harmless error analysis in criminal trials.
 
 See
 
 Power v. State, 102 Nev. 381, 382, 724 P.2d 211, 213 (1986) (citing Chapman v. California, 386 U.S. 18 (1967)). Assuming that introduction of the affidavit was error, in light of the overwhelming evidence it was harmless. As stated, although O’s husband
 
 *1088
 
 was not at the hearing and therefore not subject to cross-examination, O herself was, and Minton expressed his primary concern to be the opportunity to attack O’s motives and credibility. Minton cross-examined O and could easily have cross-examined her regarding these matters.
 

 For all the reasons stated above, we affirm the district court judge’s denial of Minton’s petition and let stand the decision of the Board to revoke his medical license.
 
 [17]
 

 [1]
 

 NRS 630.304(5) provides, in relevant part:
 

 The following acts, among others, constitute grounds for initiating disciplinary action or denying licensure:
 

 5. Influencing a patient in order to engage in sexual activity with the patient or with others.
 

 [2]
 

 NRS 630.306(2) provides, in relevant part:
 

 The following acts, among others, constitute grounds for initiating disciplinary action or denying licensure:
 

 2. Engaging in any conduct:
 

 (a) Which is intended to deceive^]
 

 [3]
 

 NRS 630.306(7) provides, in relevant part:
 

 The following acts, among others, constitute grounds for initiating disciplinary action or denying licensure:
 

 7. Continual failure to exercise the skill or diligence or use the methods ordinarily exercised under the same circumstances by physicians in good standing practicing in the same specialty or field.
 

 [4]
 

 NRS 630.301 provides, in pertinent part:
 

 The following acts, among others, constitute grounds for initiating disciplinary action or denying licensure:
 

 3. [Now 4.] Gross or repeated malpractice, which may be evidenced by claims of malpractice settled against a practitioner.
 

 [5]
 

 The Board found that “breast examinations performed in [Minton’s] private office while the women were fully clothed and seated in an office chair were conducted in a manner and a physical setting which may have created, or contributed, to a perception that the examination was inappropriate, or improper.” However, the Board found that with respect to those complaining witnesses “who were all scheduled for oral surgery, a breast examination, as part of a routine pre-operative history and physical, may have been performed within an acceptable standard of care.” The Board then concluded that “applying the standard of clear and convincing evidence, there is insufficient evidence establishing that the breast examinations constituted conduct in violation of [NRS 630.306(2)(a), and NRS 630.306(7).]”
 

 [6]
 

 Patient D recounted the following conversation with her mother:
 

 Mom, it went fine. He opened the area. But I know this sounds funny, but I think Dr. Minton was playing with my breasts. And she quite honestly, she said, “[her name].” I know, Mom. I know that sounds strange. I know that sounds funny . . . And she says, “Well, you know, could it be.” I guess it could be that I was under the affect [sic] of anesthesia or a pain med or whatever, and it was — it was all a hallucinatory thing.”
 

 [7]
 

 This is not oral surgery, but rather is a procedure in which Minton, with gloved hands, would massage both the inside and outside of the patients face and jaw.
 

 [8]
 

 Patient O testified that when Minton first told her he was going to do a breast examination before dental surgery that she “looked at him kind of quizzically, and he assured me that it was normal procedure.” She said that “a lot” of things made her uncomfortable about it, such as “[t]he way it was done, how close he was to me when it was done,” and that it was “not like a breast exam that I had had by any of my previous physicians.” All the testimony about these “uncomfortable” examinations was brought out on cross-examination, and O stated that she continued to return because she “thought it was my own paranoia or whatever. I — he assured me it was normal procedure. I tried to blow it off and think, ‘Well, maybe it’s just because we’re doing it in a different kind of setting.’ I didn’t want to think that he was being inappropriate.”
 

 [9]
 

 None of the information presented to this court indicates that Dundee ever conducted a study. Instead, Dundee, who was a professor emeritus in Anesthetics at the Queen’s University of Belfast, collected eleven isolated reported incidents from a variety of countries and reported them in an article titled, “Further Data on Sexual Fantasies During Benzodiazepine Sedation.” Dundee posited that an ordinary incidence of physical contact could be a
 
 *1075
 
 stimulus that might influence a patient on general anesthesia to transfer the ordinary contact into a sexual perception. However, as Minton himself notes, Dundee also plainly wrote that he could not definitely exclude the possibility of the reports being “genuine complaints.”
 

 [10]
 

 This assertion was contradicted by a November 22, 1991 letter written by Minton to Patricia Perry, Executive Director of the Nevada State Board of Medical Examiners. This letter was admitted at the hearing. In the letter Minton attempted to explain and justify to the Board the complaint of a former twenty-year old patient of Minton’s (who later became patient “B” in the complaint). She had became upset over a pre-operative breast examination and cancelled her surgery with Minton. She apparently was concerned over the length of the exam and the fact that Minton performed it alone in his private office.
 

 Minton wrote a three-page letter, which,
 
 inter alia,
 
 referred to the Clarence Thomas hearings and the Mike Tyson rape trial. He stated in the letter that “[the complainant] could feel free to call [him] at the office anytime or come by and
 
 learn
 
 about what comprises an adequate breast examination,” (emphasis in original), and that he now “cast[s] a suspicious eye on any patient [he] sees.” and that if “[the complainant] feels self-conscious about [her] large breasts, that is
 
 her
 
 problem.” (Emphasis in original).
 

 [11]
 

 This court does, however, exercise independent review over professional discipline matters involving attorneys because of its authority to govern the legal profession and its inherent authority flowing therefrom to discipline attorneys.
 
 See
 
 SCR 39, 99(1); State Bar of Nevada v. Claiborne, 104 Nev. 115, 126, 756 P.2d 464, 471 (1988).
 

 [12]
 

 Minton provided notarized letters written by the following individuals: Stacy Trivitt (relation, if any, not disclosed), Láveme M. Souza (same), Jon Thomas Driscoll (Minton’s “nephew-in-law”), Patricia T. Driscoll (Min-ton’s sister-in-law), Carol Driscoll (relation not disclosed, but same last name as two other writers); Hanson Troberman (relation, if any, not disclosed), Cheryl Romigh (same), Gary LaFleur (same), Debra LaFleur (same), Jeanne Minton (Minton’s wife), Garland A. Minton (Minton’s father), and Shirley A. Minton (Minton’s mother).
 

 [13]
 

 NRS 233B. 135(1) provides in full:
 

 1. Judicial review of a final decision of an agency must be:
 

 (a) Conducted by the court without a jury; and
 

 (b) Confined to the record.
 

 In cases concerning alleged irregularities in procedure before an agency that are not shown in the record, the court may receive evidence concerning the irregularities.
 

 [14]
 

 Minton implicitly concedes that abuse of discretion is the proper standard of review, as he argues that the judge’s denial of his motion was an abuse of discretion.
 

 [15]
 

 We note that the district court judge’s ruling was to deny the motion to supplement the record. However, from the ruling it appears that the judge
 
 *1082
 
 read and considered the letters and affidavits in light of the entire record and concluded that no due process violation occurred. Although the letters were never made part of the record on review, they were presented to us so that we could determine whether the judge improperly denied the motion to supplement the record. We also have considered the underlying substantive claim to determine whether the judge’s ultimate ruling (that no due process violation occurred) was correct.
 

 [16]
 

 These rules (applicable to all civil and criminal trials in Nevada) recognize the importance of preserving the “decorum and dignity of the court,” and require limitations imposed when any media representative is “interfering in any way with the proper administration of justice.” SCR 235, 231.
 

 [17]
 

 The Honorable Thomas L. Steffen, Justice, voluntarily recused himself from participation in the decision of this appeal.