2004 WY 42

John R. BILLINGS, Licensed Outfitter, License No. BFG–295, Appellant (Petitioner),

v.

WYOMING BOARD OF OUTFITTERS AND PROFESSIONAL GUIDES, Appellee (Respondent).

and

John R. Billings, d/b/a Open Creek Outfitting; and Open Creek Outfitting, LLC, Appellants (Plaintiff),

v.

Wyoming Board of Outfitters and Professional Guides, Appellee (Defendant).

No. 03–20.

Supreme Court of Wyoming.

April 20, 2004.

Representing Appellants: Daniel B. Frank of the Frank Law Office, P.C., Cheyenne, Wyoming; and S. Joseph Darrah of Darrah, Darrah & Brown, P.C., Powell, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Robin Sessions Cooley, Senior Assistant Attorney General; and Kennard F. Nelson, Senior Assistant Attorney General, Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶1] In February 2002, the Wyoming Board of Outfitters and Professional Guides (Board) revoked appellant John R. Billings' (Billings) outfitter's license based on several violations of state statutes and/or the Board's rules. Billings subsequently filed a petition for review of the Board's decision, and a complaint for declaratory judgment, in the district court. Following the district court's respective rulings, three incidents underlying these violations remain at issue on appeal: (1) Billings' livestock and its proximity to his lower hunting camp and that camp's water supply; (2) whether Billings failed properly to dispose of a dead mule carcass; and (3) whether Billings willfully endangered Sandra Ditzler's health and safety while traveling

from the lower hunting camp to the trail-head.

[¶ 2] Billings argues that the evidence was insufficient to support the Board's findings that Billings' conduct violated state statutes and/or the Board's rules and that the Board did not sufficiently explain why it revoked Billings' license rather than impose a lesser sanction. He also raises several issues regarding the constitutionality of state statutory provisions and the Board's rules. We affirm.

## ISSUES

[¶ 3] We rephrase the parties' issue statements as follows:

1. Whether the record contains sufficient evidence that:

A. Billings willfully endangered the health and safety of consumers of the lower camp's water supply, maintained an unsanitary camp, failed to keep livestock facilities separate from camp facilities, and failed to protect a stream from contamination;

B. Billings violated a significant federal regulation pertaining to wildlife, game and fish; and

C. Billings willfully endangered the health and safety of Sandra Ditzler.

2. Should we find sufficient evidence to support one or more of these violations, was the Board's decision to revoke Billings' outfitter's license proper?

3. Whether the constitutionality of Wyo. Stat. Ann. § 23–2–416(a)(v) (LexisNexis 2003) remains at issue on appeal?

4. Whether Wyo. Stat. Ann. § 23–2–416(a)(iv) and (ix) and Chapter 3, Section 1(n) (1997) of the Board's rules are unconstitutionally vague?

5. Whether Billings has standing to challenge the constitutionality of Chapter 3, Section 2 of the Board's rules?

## FACTS

[¶ 4] Appellant Billings is an outfitter licensed by the Board. Billings has provided commercial outfitting services in the Bridger Teton National Forest since the early 1980s. His business consists of outfitting hunters, through the use of horses and mules, into an area near the southeast corner of Yellowstone Park, in the Thorofare River Drainage. There, Billings maintains two hunting camps. His lower hunting camp is approximately 37–39 miles from the Ishawooa Creek Trailhead while his upper hunting camp is located 30–32 miles from that trailhead. Billings also maintains a "layover" camp along the Ishawooa Creek Trail, where clients stop overnight en route to the hunting camps. The hunting camps may also be reached by way of a trail known as the Deer Creek Trail.

On July 20, 1998, the Board filed a complaint against Billings seeking censure, suspension, or revocation of Billings' outfitter's license. The Board's complaint was based on written complaints from hunters who hired Billings' during the 1996 and 1997 hunting seasons. The Board's complaint first alleged that Billings acted unethically and dishonorably in the treatment of, and correspondence with, his clients. The complaint next alleged that Billings had willfully endangered his clients. One endangerment allegation asserted the abandonment of clients on Deer Creek Trail as the clients packed out of camp. The other willful endangerment allegation asserted Billings had permitted a client to lead a troublesome mule, Mel, along the trail and that the client was eventually kicked in the chest by the mule. (The evidence produced at the hearing indicated that the client, Dan Nutsch, was actually kicked by the mule he had been riding, Bo, when he dismounted Bo in order to gather up troublesome Mel.)

The complaint also alleged that Billings had violated significant federal regulations pertaining to wildlife, game, and fish by (1) improperly disposing of a mule carcass, in violation of 36 C.F.R. § 261.58(s); and (2) caching items in the wilderness without permission from the United States Forest Service in violation of 36 C.F.R. § 261.57(f). The complaint further alleged that Billings had failed to maintain neat and sanitary camps and that Billings had

substantially breached his contract with his clients by, inter alia, utilizing hunting guides who were not properly trained and by failing to maintain a sufficient number of employees in camp. The complaint finally alleged that Billings had treated his livestock in an inhumane fashion.

After four days of hearings, held December 11, 1998, and February 2–4, 1999, the Board issued its findings of fact and conclusions of law on April 22, 1999, revoking Billings' outfitters license. . . .

. . .

The Board also specifically found and concluded that Billings did not engage in the inhumane treatment of his livestock. The Board did not make any findings regarding the allegation that Billings had illegally cached items in the wilderness.

Billings filed a combined petition for review and complaint for declaratory judgment with the district court, which certified the case pursuant to W.R.A.P. 12.09. *Disciplinary Matter of Billings,* 2001 WY 81, ¶¶ 3–6, 8–9, 30 P.3d 557, 562–64 (Wyo.2001) (*Billings I*).[1]

[¶ 5] In *Billings I,* 2001 WY 81, ¶¶ 19, 23, 42, 30 P.3d at 567–68, 573, we proceeded to resolve several issues raised by Billings, and ultimately concluded that the Board's findings were "inadequate to permit appellate review," that the Board exceeded its statutory authority in promulgating two of its rules, and that the district court was without authority to certify the declaratory judgment action to this Court. We remanded the case to the district court "with instructions to enter a judgment vacating the order of the Board and remanding the proceedings to the Board for further proceedings consistent with [our] opinion." *Id.,* 2001 WY 81, ¶ 43, 30 P.3d at 573.

[¶ 6] On remand, the Board issued new findings of fact and conclusions of law on February 26, 2002, and again revoked Billings' outfitter's license. In March 2002, Billings filed a Petition for Review of Agency Action, Request for Stay and Complaint for Declaratory Judgment. The district court

bifurcated its consideration of the complaint for declaratory judgment and the petition for review. The district court found that Wyo. Stat. Ann. § 23–2–416(a)(v) was unconstitutionally vague, but otherwise rejected the constitutional arguments Billings raised in seeking a declaratory judgment. The district court affirmed the Board on the issues raised in Billings' petition for review. Billings now appeals the district court's adverse rulings. The Board did not cross-appeal the district court's decision on the constitutionality of Wyo. Stat. Ann. § 23–2–416(a)(v).

## STANDARD OF REVIEW

[¶ 7] Under the circumstances of the instant case, Wyo. Stat. Ann. § 23–2–416(c) provides for judicial review of license revocation proceedings pursuant to the Wyoming Administrative Procedure Act. Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2003) sets forth the standards for judicial review of agency action:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

---

1. *Billings v. Wyo. State Bd. of Outfitters and Professional Guides,* 837 P.2d 84 (Wyo.1992) involved the same parties, but is not factually relevant to the current dispute between the parties.

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 8] As we said in *Bryant v. State ex rel. Wyoming Dept. of Transp.*, 2002 WY 140, ¶ 9, 55 P.3d 4, 8 (Wyo.2002), we do not

afford any special deference to the district court's decision when we review a matter initiated before an administrative agency. Rather, this court reviews the case as if it came directly from the administrative agency.... Our review must focus on the evidence and consider the reasonableness of the agency's exercise of judgment while determining if the agency committed errors of law.... If the agency committed any errors of law, this court must correct them.

*See also State ex rel. Dept. of Transp. v. Legarda*, 2003 WY 130, ¶ 10, 77 P.3d 708, 712 (Wyo.2003). In the instant case, both parties submitted evidence. We afford respect and deference to the Board's findings of fact if they are supported by sufficient evidence and we will not substitute our judgment for that of the Board's when sufficient evidence supports the Board's decision. *Hermosillo v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2002 WY 175, ¶ 6, 58 P.3d 924, 926 (Wyo.2002). We examine the entire record to determine whether sufficient evidence supported the Board's findings. *Id.* Even if the Board's factual findings are found to be supported by sufficient evidence, the ultimate agency decision may be found to be arbitrary or capricious for other reasons. *Id.* We do not examine the record only to determine if there is sufficient evidence to support the Board's decision, but we must also examine the conflicting evidence to determine if the Board could have reasonably made its findings and order upon all of the evidence before it. *Id.*

A disciplinary proceeding before a licensing board is an adversary proceeding where the burden is on the complaining party to present its case in a proper manner and to state with precision the charges against the licensee. *Dorr v. Wyoming*

*Board of Certified Public Accountants*, 2001 WY 37 ¶ 8, 21 P.3d 735 ¶ 8 (Wyo. 2001); *Devous v. State Board of Medical Examiners*, 845 P.2d 408, 416 (Wyo.1993). Those charges must be established by clear and convincing evidence. *Id.; Painter v. Abels*, 998 P.2d 931, 939–40 (Wyo. 2000).

*Billings I*, 2001 WY 81, ¶ 11, 30 P.3d at 565. Accordingly, we seek to determine "whether the evidence adduced at the hearing was sufficient to have convinced the deciding body that violations had been shown by clear and convincing evidence." *Minton v. Board of Medical Examiners*, 110 Nev. 1060, 881 P.2d 1339, 1352 (1994). In other words, the "judicial eye looks to see" whether a reasonable or "fair-minded fact finder might have found the evidence clear and convincing that the offense had occurred...." *See Riddle v. Mississippi State Bd. of Pharmacy*, 592 So.2d 37, 41 (Miss.1991).

[¶ 9] " 'Clear and convincing evidence is something more than a preponderance, but less than proof beyond a reasonable doubt.' " *Brierley v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 2002 WY 121, ¶ 14, 52 P.3d 564, 570 (Wyo. 2002) (quoting *Bando v. Clure Bros. Furniture*, 980 P.2d 323, 329 (Wyo.1999)).

Clear and convincing evidence is the "kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 839 (Wyo.1980); *see also Dorr v. Wyoming Board of Certified Public Accountants*, 2001 WY 37, ¶ 8, 21 P.3d 735, ¶ 8 (Wyo. 2001); *Meyer v. Norman*, 780 P.2d 283, 291 (Wyo.1989). Evidence which is of such a nature that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a disputed fact is, of necessity, clear and satisfactory. *RS v. Johnson County Department of Family Services (In re JL)*, 989 P.2d 1268, 1271 (Wyo.1999); *Thomasi v. Koch*, 660 P.2d 806, 811–12 (Wyo.1983); *Continental Sheep Co. v. Woodhouse*, 71 Wyo. 194, 256 P.2d 97, 99 (1953).... We have also adopted more objective criteria for clear

and convincing evidence with respect to witnesses' testimony:

" '[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.' " *Weigand v. Union National Bank of Wichita,* [227 Kan. 747], 610 P.2d 572, 577 (Kan. 1980).

[*Meyer,* 780 P.2d at 291.]

*Alexander v. Meduna,* 2002 WY 83, ¶ 29, 47 P.3d 206, 216 (Wyo.2002). We note that the Board did not specifically find any witness to be credible or not credible.

▮ [¶ 10] The issues addressed herein pursuant to Billings' complaint for declaratory judgment all involve questions of law, which questions are reviewed *de novo. Airtouch Communications, Inc. v. Department of Revenue, State of Wyo.,* 2003 WY 114, ¶ 9, 76 P.3d 342, 347 (Wyo.2003).

### DISCUSSION

**PETITION FOR REVIEW**

[¶ 11] On remand, the Board utilized five incidents in finding that Billings violated state statutes and the Board's rules. However, the Board utilized two separate incidents in finding two separate violations of Wyo. Stat. Ann. § 23–2–416(a)(v), which statute the district court found unconstitutionally vague.[2] Because the Board did not cross-appeal that decision, three incidents remain at issue in the instant appeal. Billings questions the sufficiency of the evidence to support the violations the Board found based on these three incidents.

**2.** Wyo. Stat. Ann. § 23–2–416(a)(v) is the only meaningful substantive provision at issue concerning these two violations. The Board found the same two violations pursuant to Wyo. Stat. Ann. § 23–2–416(a)(x) and Chapter 3, Section 1(t) of the Board's rules. But subsection (a)(x) of the statute provides only that the Board may

*Lower Hunting Camp Water Supply and Related Issues*

▮ [¶ 12] Billings argues that the evidence was insufficient to support the Board's findings that in allowing or permitting his livestock to remain and leave excrement near the lower camp's water supply, Billings willfully endangered the health and safety of consumers of that water supply, maintained an unsanitary camp, did not keep livestock facilities separate from camp facilities, and failed to protect a stream from contamination. Specifically, the Board found as follows:

6. On or about Fall, 1997, Billings was hired to provide outfitting services to a client by the name of Henry Krantz.

A. During Krantz's hunting trip with Billings, Krantz noticed one of Billings' horses urinating in a stream and saw both fresh and old horse manure by the same stream that the camp's cook retrieved water for the cook tent. . . .

B. Krantz took pictures of the area, which demonstrated the proximity of the horse manure to the stream. . . .

C. Krantz also took a video, which showed the horses were actually inside the camp area. . . .

D. Krantz's recollection of what he witnessed was corroborated by his pictures, video and the complaint he filed with the Board on October 19, 1996— almost immediately following his outfitting trip with Billings. . . .

E. Billings knew the hazards associated with humans consuming water in which an animal was urinating or defecating when he acknowledged horses should not be near the camp's water supply. . . .

F. By allowing his livestock to remain in and near the camp water supply utilized for human consumption and

suspend or revoke a license for a violation "of this act or any rule or regulation of the board" and Chapter 3, Section 1(t) of the Board's rules provides that a licensee "shall not violate any provision of the Act [defined by Chapter 1, Section 2(a) of the Board's rules as Wyo. Stat. Ann. § 23–2–406 et seq.]"

by allowing his livestock to leave excrement near the water supply, Billings willfully endangered the health and safety of consumers of the water supply, failed to maintain a sanitary camp, failed to separate camp facilities from livestock facilities, and failed to protect the stream from contamination.

The Board concluded that, as a matter of law, Billings "permitted livestock to remain in and near the camp water supply and left livestock excrement near this water supply which was ultimately utilized for human consumption" in violation of Wyo. Stat. Ann. § 23–2–416(a)(ix) and (x) and Chapter 3, Sections 1(n), (o) and (t) of the Board's rules.

[¶ 13] Our review of the record does not reveal sufficient evidence to support the Board's finding that Billings willfully endangered the health and safety of those consuming water from the lower camp's water supply. Wyo. Stat. Ann. § 23–2–416 provides, in pertinent part:

> (a) The board may ... suspend or revoke a license issued under this act for any of the following causes:
>
> ...
>
> (ix) Willfully endangering the health and safety of any person[.3]

When "looking at the willfulness of a licensee's conduct, this court's duty [is] 'to determine if the evidence establishes intentional, or knowing, or voluntary acts as distinguished from accidental.' " *Billings I*, 2001 WY 81, ¶ 34, 30 P.3d at 571 (*quoting Kirbens v. Wyoming State Bd. of Medicine*, 992 P.2d 1056, 1064 (Wyo.1999)). The term "endanger" has "an easily and commonly understood meaning...." *Billings I*, 2001 WY 81, ¶ 34, 30 P.3d at 571 (*quoting Campbell v. State*, 999 P.2d 649, 658 (Wyo.2000)). We have said that the plain meaning of "endan-

ger" is " 'to bring into danger or peril.' " *Worcester v. State*, 2001 WY 82, ¶ 25, 30 P.3d 47, 55 (Wyo.2001) (*quoting* Merriam Webster's Collegiate Dictionary 381 (10th ed.1999)).

[¶ 14] Krantz stayed at Billings' lower hunting camp near Open Creek for several days while hunting. The lower camp's natural water supply consisted of an area known as the "spring" (where "water washes through the gravel ... underground") and a small creek that flowed from the spring. The spring is located approximately thirty yards east of the camp's cook tent. The camp sits on a "bench," which bench is elevated about fifteen feet above the spring. Billings acknowledged that the "cook gets water for the camp generally" from the area of "this stream or little spring" and that it is "not a good idea to have horses near your water supply...."

[¶ 15] Contrary to the Board's findings, the record is not clear that a horse urinated "in" the creek or, for that matter, that any excrement contaminated the spring or creek. After arriving at the lower camp, Krantz noticed "horses roaming and feeding on the grass" in a meadow near the spring and saw a particular black horse "wandering around a small stream of water." He did not specify how close the meadow was to the spring, the creek, or the camp. Krantz wrote in an October 1996, letter to the Board that the black horse "urinated in the water" and left "manure on the bank next to the water." However, Krantz testified during the contested case hearing that the black horse urinated "[p]robably 2 feet, 3 feet" from the spring, noting specifically that it "wasn't the creek but it's the spring." He further observed "manure, fresh as well as older, right at where that spring was," some "right along the bank" and some "right at the water." [4]

---

**3.** Chapter 3, Section 1(o) of the Board's rules similarly provides that a "licensee shall not willfully endanger the health or safety of the public" and Section 1(t) states that a "licensee shall not violate any provision of the Act."

**4.** After his testimony was completed, Krantz supplied the Board (at the Board's request) with photographs from his hunting trip, which the Board admitted, without objection, as an exhibit.

Krantz did not specifically testify to the contents of the photographs or how the photographs corresponded with his testimony regarding what he observed at the lower camp.

Some of the photographs depict two areas: an area near the spring and an area near the creek. Two to three locations near the spring and two to three locations near the creek are circled on the photographs, presumably to indicate piles of manure. It is not apparent from the record who

Krantz did not indicate how many piles of manure he observed, how much of the manure was old manure versus new manure, and aside from the black horse that left new manure "on the bank next to the water," Krantz did not otherwise identify the "manure" he observed as "horse" manure.[5]

[¶ 16] Between twenty or thirty minutes and an hour later,[6] Krantz saw the camp cook go "downstream a little ways" from where Krantz observed the black horse urinate "and [he] gets the water for the cook tent." Beyond this vague reference, the record does not establish the purpose for which this water was actually utilized or that this water was ever utilized for human consumption. Krantz did not say anything to the cook (or apparently anyone else) about the "potentially contaminated" water.[7] He later asked the cook whether the water was filtered, to which the cook replied "[n]o, in fact, we had a doctor in here a couple of outfits ago and was very upset, too...." Yet, Krantz continued to drink water from that area "after it was boiled as much as [possible]" (he "never drank so much coffee" in his life) and to eat food prepared with water from the area.[8] "[M]ost of the time," he also used a water bottle to retrieve water from the creek to drink in his camp tent. Krantz did not "get sick."

[¶ 17] The record was not sufficient for the Board to conclude that Billings intentionally, knowingly, or voluntarily, as distinguished from accidentally, allowed or permitted livestock to remain near the camp water supply and to leave excrement near the wa-

ter supply. Several witnesses provided evidence on the lower camp's configuration and where the livestock was confined, the frequency of livestock in the spring area, the circumstances in which livestock might briefly become loose and what actions were taken when someone discovered loose livestock.

[¶ 18] The lower camp included an area of tents utilized by those staying and working in camp, a "tack" area with "hitch rails" (an "enclosure" for a pack train of up to twenty mules, "all tied up and ready for the next phase of the operation") north of these tents, and livestock corrals north of the tack area. While at the lower camp, some livestock was kept on a "picket"[9] and the "majority of the animals" were pastured for six-and-one-half weeks out of the eight-week hunting season in a large meadow across Open Creek[10] from the camp. According to Billings, there were times when rotating the livestock that "[m]aybe a few" horses were turned loose "clear up the creek" drainage to feed in the meadows.

[¶ 19] Just to the east of the spring, a mobile electric fence pen was at times also used to hold five or six saddle horses or mules. According to Billings, the pen kept "horses away from the water supply" and provided a "ready reserve of horses in proximity to camp and not too far from the corrals where" one could "get ready to saddle up and take people hunting." Jim Bruno, a professional guide at the lower camp, further testified that if

circled these locations nor is it readily apparent from the photographs what is contained in the circled locations. Two circled locations (one near the spring and one near the creek) do not even appear to correspond to any decipherable object. Neither Krantz's written statement, nor his hearing testimony, specifically refers to "manure" in the creek area.

5. Indeed, Krantz also referred to "bear sign" as "manure" during his testimony.

6. Krantz testified at the hearing that it was an hour later, but his October 1996, letter states that it was "about" twenty to thirty minutes later.

7. Billings testified that had Krantz informed someone of what he observed, any resulting problems could have easily been solved.

8. Krantz did not eat dinner the night he observed the black horse near the spring, but did not state that this was due to any concerns regarding what he had previously observed.

9. A "picket" is a stake driven into the ground, to which livestock is tied through the halter via a thirty—to forty-foot rope on a swivel.

10. The lower camp's tents were about one-hundred-fifty yards from Open Creek. For purposes of this issue, it does not appear that Open Creek is considered the same body of water as the spring or the creek flowing from the spring.

we knew we were going to need a couple hunter horses the next morning, we'd keep them over there in that fence so they were easier to catch but they were able to eat grass all night.

Bill Crooks, another professional hunting guide for Billings, stated that while the electric fence pen was enclosed at all times, they would sometimes "maybe lose some horses" for one or two hours while moving the fence and "have to run after them or kind of contain them as you were moving the fence."

[¶ 20] Krantz himself testified that the camp staff "always" kept the livestock "down the creek from where we were after that ... first day" and that shortly after he observed the referenced black horse urinate, the "wranglers had taken the horses off somewhere else." While horses "were loose in camp quite often," the "only time" Krantz saw horses loose in the spring area was when he observed the black horse urinate. Billings testified that he never observed, or had personal knowledge of, a horse "being next to the spring during the hunting season of 1996" and never received a complaint regarding livestock near the water supply during Krantz's trip.

[¶ 21] Jim Bruno, who had been a professional guide for Billings since 1991, added:

[Billings' counsel]: Is there—can horses go around that [spring] area?

A. They can. They can.

Q. Are they supposed to be around there?

A. No, not really. They really don't go there, though. They just don't hang around there. I mean, they can get there if they wanted to.

Q. Do you do anything to keep them from going there?

A. Well, generally no, because usually we have that electric fence up in that area and it kind of is in the position where it

blocks them from getting there easily. It's just not a place they go.

Q. So it's not something you usually—

A. We never take any precautions to keep them away from there because we've never had a problem of them being there. In all the years I've been there I've never seen the mules or the horses congregate around the drinking well.

Q. Have you ever seen one in the area?

A. Yeah.

Q. What do you do when you see one there?

A. Run it off. If not, catch it and just bring it back to where it's supposed to be, but generally we keep the horses on picket far away from the drinking water and that's where the mules—the mules stick with the picket horses.

[¶ 22] As to the remaining violations, Wyo. Stat. Ann. § 23–2–416(a)(x) states that the Board may suspend or revoke a license for a violation of "any rule or regulation of the board." Chapter 3 of the Board's rules provides, in pertinent part:

> Section 1. Rules of Professional Conduct. The following includes, but is not limited to, rules of professional conduct, a violation of which may be considered unethical or dishonorable conduct;
>
> . . .
>
> (n) A licensee shall maintain neat, orderly and sanitary camps at all times.... Livestock facilities shall be separate from camp facilities. Streams shall be protected from contamination.

[¶ 23] Based on the state of the record and the Board's findings, the issue appears to be not so much whether Billings maintained a neat, orderly and sanitary camp, but rather whether livestock facilities were separate from camp facilities, particularly the spring area.[11] Importantly, the rule does not

---

**11.** Billings testified that in terms of cleanliness, the camp "is to be impeccable and kept that way." Krantz testified that "in general," the lower camp was sanitary. According to Jim Bruno, the hunting camps were "clean." Owen Tucker, a professional guide, testified that "cleanliness was good and the camp was ... well maintained," and that compared to other

outfitters he had worked for, Billings' camps were "as good or better than any of them...." Michael Melnar, who accompanied hunters and livestock along the trail for Billings, testified that in 1997, the hunting camps were "very clean." Robert Marvin, a hunter who had been on twenty-five outfitted hunts including several with Billings, testified that Billings' hunting camps were

prohibit the livestock's presence in camp facilities per se, but requires that camp "facilities" be separate from livestock "facilities." The term "facility" connotes a use for a particular function; something that is "built or installed to perform some particular function" or "something that promotes the ease of any action or course of action." Black's Law Dictionary at 591 (6th ed.1990).

[¶ 24] The record was insufficient for the Board to conclude that the spring area or creek was used as a livestock "facility," considering the above-referenced evidence regarding the lower camp's configuration and where the livestock was confined, the frequency of livestock in the spring area, the circumstances in which livestock might briefly become loose and what actions were taken when someone discovered loose livestock. Although the Board appears to have based its conclusions on its finding that Billings allowed or permitted the livestock to remain in the spring area, the Board also found that Krantz's video showed horses "inside the camp area" [12] and Krantz testified that horses were often "loose in camp." Once again, these general references do not indicate the livestock's location in relation to particular camp facilities, what the livestock was doing while there, or delineate precisely what livestock "facility" Billings failed to separate from what camp "facility." The rule's use of the term "facilities" would seem to require more than the livestock's mere presence in an unspecified area of the "camp."

[¶ 25] Given the referenced evidence, and that the record does not sufficiently establish that any livestock excrement ever contaminated the spring or creek, the evidence was similarly insufficient to support a violation for failing to protect the stream from contamination.

### Violating a Significant Federal Regulation Pertaining to Wildlife, Game, and Fish

■ [¶ 26] Billings argues that he did not violate a significant federal regulation pertaining to wildlife, game, and fish by improperly disposing of a mule carcass. In this regard, the Board found as follows:

5. We find that on or about August 25, 1997, Billings violated significant federal regulations pertaining to wildlife, game and fish in that he failed to properly dispose of the carcass of a dead mule as required by 36 C.F.R. 261.58(s), Special Order, relating to Grizzly Bears, properly issued by the United States Department of Agriculture, Forest Service.

A. Billings was issued a special use permit by the U.S. Forest Service.... The special use permits mandated compliance with the Grizzly Bear Management and Protection Plan....

B. Billings was also issued a Forest Service Order which specified the purpose of such an order was "minimizing grizzly/human encounter[s]." ... The Order also set forth the requirements of 36 C.F.R. 261.58(s) and specifically prohibited Billings from possessing or leaving unattended any animal carcass unless the carcass was (a) at least½ mile from any sleeping area, trail, or recreation site or (b) at least 100 yards from any sleeping area, trail or recreation site and acceptably stored, or (c) being eaten, being prepared for eating or being transported....

C. Billings' employee, Bill Crooks, testified in detail that he—along with two other individuals and Billings—drug a dead mule and left it somewhere between 250 and 275 yards from camp and 75 yards from the trail.... He further testified the carcass was "bound to attract bears" and that he witnessed several bears feeding on the carcass and at one point witnessed up to eight grizzly bears feeding on the mule's carcass at once....

D. Billings admitted he knew the scent of a carcass could attract bears and

"as good as any" others he had seen. Lon Hoyer, who hunted in Billings' camps in 1997, testified that Billings' camp was "a lot better than a lot of camps I've had myself" in terms of cleanliness.

12. The Board did not refer to any particular portion of the video when making this finding.

that close proximity of the carcass to humans could therefore, be dangerous.... He further admitted that while he attempted to move the carcass away from the camp, it was not moved far enough from the camp in accordance with his special use permit and the federal regulation....

E. 36 C.F.R. 261.58(s) is a significant federal law pertaining to wildlife, game and fish which is designed to protect an endangered species and to minimize grizzly/human encounters.

The Board concluded that, as a matter of law,

7. ... Billings violated a significant federal law pertaining to wildlife, game and fish on or about August 25, 1997. Specifically, Billings failed to properly dispose of a dead mule's carcass as required by 36 C.F.R. 261.58(s), Special Order properly issued by the United States Department of Agriculture, Forest Service. That particular federal regulation is a significant federal law in that its purpose is to minimize grizzly/human encounters and protect an endangered species. By violating 36 C.F.R. 261.58(s), Billings violated a significant federal law and such conduct therefore, is a basis for revocation of his license pursuant to WYO. STAT. 23–2–416(a)(iv), (x) and the Board's Rules and Regulations, Chapter 3, Section 1(t).

13. Chapter 3, Section 1(t) of the Board's rules provides that a licensee "shall not violate any provision of the Act."

14. 36 C.F.R. § 261.50(a) and (b) provide:
 (a) The Chief, each Regional Forester ... and each Forest Supervisor may issue orders which close or restrict the use of described areas within the area over which he has jurisdiction. An order may close an area to entry or may restrict the use of an area by applying any or all of the prohibitions authorized in this subpart or any portion thereof.
 (b) The Chief, each Regional Forester ... and each Forest Supervisor may issue orders which close or restrict the use of any National Forest System road or trail within the area over which he has jurisdiction.

15. Billings does not contend that the incident at issue occurred outside the areas regulated by the Order.

[¶ 27] Wyo. Stat. Ann. § 23–2–416(a) provides, in pertinent part:
 (a) The board may ... suspend or revoke a license issued under this act for any of the following causes:

 . . .

 (iv) Violation of any significant federal or state law or related regulations pertaining to wildlife, game and fish;

 . . .

 (x) Violation of this act or any rule or regulation of the board.[13]

With the "primary goal of minimizing grizzly/human encounters and thereby providing for user safety and" grizzly bear protection, a Special Order was implemented pursuant to 36 C.F.R. § 261.50(a) and (b) (2003) [14] prohibiting the following:
 The following acts are prohibited while occupying or using the grizzly bear use areas shown in Exhibit A of this Order.[15]

 1. Possessing or leaving unattended any animal carcass (36 CFR 261.58(s)) [16] unless the carcass is:

 (a) at least½ mile from any sleeping area, trail, or recreation site or

 (b) at least 100 yards from any sleeping area, trail or recreation site and acceptably stored, or

 (c) being eaten, being prepared for eating or being transported.[17]

[¶ 28] While Billings admitted during his hearing testimony that he did not dispose of

16. 36 C.F.R. § 261.58 (2003) states, in pertinent part:

 When provided by an order, the following are prohibited:
 . . .
 (s) Possessing, storing, or transporting any bird, fish, or other animal or parts thereof, as specified in the order.

17. The Order defines an "[a]nimal carcass" as "the dead body or parts thereof, of any mammal, bird, or fish including domestic livestock" and "[a]cceptable storage" as "stored in a bear resistant container," "stored in a closed vehicle constructed of solid, nonpliable material," or "suspended at least 10 feet clear of the ground at all points and 4 feet horizontally from any supporting tree or pole."

the mule carcass according to the referenced Order's distance requirements, Billings contends that he "took every common sense precaution available" to comply with the regulation and to minimize the issues concerning human/bear interaction. Billings does not cite to any pertinent legal authority in advancing this argument.

[¶ 29] Bill Crooks, a professional hunting guide, testified that in August 1997 (prior to any hunters arriving), he and three others (including Billings) were setting up the hunting camps when a "thousand, 1100–pound" mule died one evening in the lower camp. The next morning, with Billings directing, they attempted to move the mule carcass, which was "quite a chore." They pulled the carcass away from camp through brush, sandbars, water, around trees, across a creek, and into timber using two saddle horses "and at times we had one, two and up to three mules in line pulling," breaking the "tree" on a pack saddle in the process. According to Crooks, they ultimately left the carcass two-hundred-fifty to two-hundred-seventy-five yards from camp, closer to camp than the designated "meat pole." Billings disputed this distance, claiming that they took the carcass approximately the same distance from camp as the meat pole (four hundred yards). Crooks also testified that Billings instructed them not to say "anything to anybody" about the carcass and told one individual to cover the carcass with cut tree limbs.

[¶ 30] Crooks, who could see the carcass' location from the lower camp area, was concerned that the carcass would attract bears

and testified there had been other human/bear confrontations in the area that year. The carcass did attract bears to the camp's vicinity, as nine or ten days later Crooks saw "bear scat around camp," and, between 3:00 p.m. and dark one day, observed a sow grizzly bear and two cubs at the carcass, another single bear at the carcass, and at some point eight grizzly bears simultaneously at the carcass. Nothing but bones remained of the carcass after that day.

[¶ 31] The Board's findings and the referenced testimony sufficiently establish that Billings violated the regulation at issue. Billings admitted as much during his testimony, and the mule carcass was well short of the distance required by the regulation even according to Billings' testimony. Billings' emphasis on what he did accomplish under the circumstances, although potentially relevant to the Board in imposing a sanction vis a vis Billings' outfitter's license for violating the regulation, does not meaningfully undermine such a conclusion and does not implicate any listed exception to the regulation's requirements.

[¶ 32] Billings also argues that the regulation/order at issue is not "significant" because the penalty specified for a violation of the Order is the equivalent of a misdemeanor,[18] and no evidence in the record indicates the Forest Service, which was apparently aware of the circumstances, attempted to enforce the regulation against Billings. With one exception,[19] Billings does not cite to any pertinent legal authority in advancing these arguments. Further, we es-

---

18. The Order states that violations are punishable by a specified fine and/or imprisonment "for not more than six months. . . ." *See also* 36 C.F.R. § 261.1b (2003).

19. In a footnote, Billings argues that the federal Forest Service had "special competence to determine whether its own regulation was violated," creating "primary jurisdiction" in the Forest Service. Citing *People v. Fremont Energy Corp.*, 651 P.2d 802, 810 (Wyo.1982), he summarily concludes that because the Forest Service "did not find a violation," "neither can the Board."

First, the state of the record appears to be that there is no evidence that the Forest Service sought formally to enforce the regulation against Billings, not that the Forest Service found no violation. As previously discussed, the record

clearly and convincingly established that Billings violated the regulation. Second, Billings' discussion of this issue (four sentences in one footnote) does not amount to cogent argument regarding how the doctrine of primary jurisdiction applies to the particular circumstances of the instant case (i.e., the application of the doctrine to issues involving a state licensing board and a federal agency, how the mule carcass incident raised issues not within the conventional experience of the Board, what legislative intent exists that the Forest Service should decide the issue initially, and how the doctrine operates to preclude the Board from addressing a licensing issue entirely or indefinitely). *See Fremont Energy Corp.*, 651 P.2d at 810–14.

sentially resolved issues concerning the regulation/order's "significance" in our prior opinion:

Despite Billings' complaints that the Board has provided no definition of which regulations will be considered significant, that is not a concern in this case. The federal regulation/order in question relates to the disposal of carcasses and was enacted to prevent those carcasses from attracting grizzly bears. Indeed, the regulation/order was implemented "with a primary goal of minimizing grizzly/human encounters." Common sense and human experience tell us that human interaction with grizzly bears is a dangerous and potentially deadly proposition. *Peterson v. Game and Fish Com'n*, 989 P.2d 113, 116 (Wyo.1999). We have no trouble concluding that a regulation/order developed to minimize such interactions is "significant."

*Billings I*, 2001 WY 81, ¶ 27, 30 P.3d at 569.

### Willfully Endangering the Health and Safety of Sandra Ditzler

[¶ 33] The Board found that Billings willfully endangered Sandra Ditzler's (Ditzler) health and safety while Ditzler was returning from the lower hunting camp to the trailhead in October 1997. Ditzler, a registered nurse, booked a trip with Billings through her fiancé, Peter D'Amico (D'Amico). D'Amico hunted on the trip, but Ditzler did not and was along for the experience and to relax in the mountains. Eric Ryan (Ryan), Roderick Ryan, Hillary Ryan, and Brian McCabe were also on the trip as hunters. Ryan knew of D'Amico prior to the trip, but D'Amico and Ditzler were, at most, Ryan's "casual acquaintances...."

[¶ 34] Billings acknowledged that he is responsible for his clients' well being, even his clients who are non-hunters. Billings knew Ditzler was "new to mountain travel." Ryan also noted that D'Amico and Ditzler were "not terribly experienced when it came to saddle stock." Ditzler had informed Sherrie Quinn, one of Billings' employees who initially accompanied the hunters from the trailhead to the hunting camps, that Ditzler "hadn't done much riding or it had been a long time since [she] had done riding and

[Sherrie] told me not to worry, that the stock was very used to the trail...."

[¶ 35] Ryan had "an extensive background in wilderness travel" and had taken two courses from the National Outdoor Leadership School (NOLS), which school teaches "the skills to be comfortable in the wilderness." Some of these skills included "foraging for food, fire starting in adverse conditions, [and] low-impact camping...." For his courses, Ryan spent two weeks backcountry skiing in Yellowstone Park during January, and three months backpacking in Kenya, where he ascended Mount Kenya (a 19,000-foot peak) and traveled the wilderness and areas frequented by dangerous game. Ryan stated that based on his discussions with Billings, Billings had "some idea" of Ryan's background as an outdoorsman, including that Ryan had participated in the NOLS. Billings testified that he knew of Ryan's NOLS participation and that Ryan was an "ice climber or he said he was, ... [had a] history of outdoor travel and interest in wilderness issues, et cetera. So I thought that [Ryan] was a pretty good guy that was qualified with survival and those types of issues."

[¶ 36] On October 8th, Billings fired two trail hands just prior to taking a new group of hunters from the trailhead to the lower camp because he suspected the employees were hung over (or had been indulging in alcohol) and they were late to work for the second time. Billings did not want to burden a remaining trail hand with running the "layover" camp and "getting these hunters up the trail and all the way into camp by himself," so Billings, the trail hand, a pack string of mules, and the group of hunters traveled together from the trailhead to the lower hunting camp in one day.

[¶ 37] Two days later, on October 10th, Eric Ryan, Roderick Ryan, Hillary Ryan, Brian McCabe, D'Amico, and Ditzler were scheduled to leave the lower hunting camp. Ryan noted that as "the staff shrank," the "impact of [Billings'] schedule in fatigue and morale was obvious." Though in the previous forty-eight hours, Billings had traveled approximately seventy-four miles on the trails with four to four-and-one-half hours of sleep (total), he decided to take this group,

their respective riding animals, and a twelve-mule pack string (hauling four elk and the party's gear, etc.) from the lower hunting camp to the trailhead by himself via the Deer Creek trail in one day.

[¶ 38] The trailhead is thirty to thirty-two miles from the lower hunting camp via the Deer Creek trail. Owen Tucker, a professional guide for Billings, stated the Deer Creek trail "is not what you call a safe, easy ridden trail, any of it," it is "all steep side hills, narrow trail" with "no place to stop" and "once you get started on it, you just need to stay going because there's not a rest spot hardly on it. There's just—it's just narrow and in a short canyon and many areas of switchbacks and many areas of just kind of ledgy, straight, dropoff canyon."

[¶ 39] Tucker added that there was "only one person in the world that pulls 13 mules out of ... Deer Creek and that's John Billings.... There's no place you can stop a string like that even hardly on the face." Billings knew that when utilizing a mule train or "a lot of stock, you kind of walk the tightrope to keep control of them. You've got to keep moving and if you do stop and they're hungry, their mind is on the trailhead and the corral and you've got everything kind of hanging by a thread." According to Billings, a "normal" pack string of mules is comprised of four to eight mules. The largest pack string Billings had utilized was sixteen, and Billings would "never give that responsibility to anybody but [himself]." When asked "if it's unsafe for others to lead in a pack string that size, why isn't it unsafe for you?," Billings replied "I don't know the answer to that question. I don't know why."

[¶ 40] The group left the lower camp the morning of October 10th. After firing the two trail hands, Billings' staff was comprised of himself, two guides, one trail hand/guide, and two cooks. Billings wanted two guides and a cook to remain in the lower camp with the new group of three hunters.[20] Instead of having one of the remaining two staff members travel with the group, Billings sent a

cook and one guide to the upper hunting camp to finish packing the upper camp because they were "at that time facing weather which was promising to be quite difficult." Billings knew that by doing so, he would not "have enough help to adequately bring out the Ryan party with more than one person" and that he "may have some difficulty with 12 mules staying with these clients by [himself] ... coming down Deer Creek Trail...." Ryan testified that he informed Billings that it was "pretty thin coverage" and a "dangerous situation" for Billings to take the group out by himself. According to Ryan, Billings was evasive and "sort of shrugged his shoulders." Ryan also stated that he discussed the situation with one of the guides in the lower camp and they both agreed that the plan posed "a high potential for serious problems."

[¶ 41] Billings took the lead with the pack string of mules. According to Ryan, Ditzler's inexperience with saddle stock was "apparent." She and D'Amico experienced "difficulty controlling their mules, some difficulty in mounting and remounting, extreme difficulty on Sandy's part in remounting" due to fear and "a lack of conditioning and flexibility." Ditzler testified that she began having a "really hard time" with her mule. It was not cooperating and when Ditzler "would get off of [the mule, it] would try and get around me on this narrow trail."

[¶ 42] The group eventually reached an area near the top of Deer Creek Pass. The trail was still "treacherous," there "was a lot of snow and the snow was melting and there was a lot of mud and so it was a little hard going." Ryan noted "a heavy cloud cover was developing" and became "concerned over the possibility of the weather deteriorating...." Parts of the trail involved switchbacks and sheer drops at the trail edge, a "lot of sheer on one side and sheer drop on the other," at times the "trail falls away hundreds of feet to streambed and the valley floor." As Billings described the area, it is "full of cliffs and precipices and balks, little

---

**20.** Wyo. Stat. Ann. § 23-2-401(a) (LexisNexis 2003) states that no nonresident "shall hunt big or trophy game animals on any designated wilderness area ... unless accompanied by a licensed professional guide or a resident guide" and that there "shall be at least one (1) licensed professional guide or resident guide accompanying each two (2) nonresident hunters."

coulees and cuts and timber down," "really dangerous" in some places.

[¶ 43] Ditzler "had a great deal of anxiety about that," was tired, hungry, and afraid of heights, and could feel herself "hyperventilating." Ryan noted Ditzler was intimidated by the heights involved and began to "exhibit signs of exhaustion." Billings recalled that at one point on the trail Ditzler was "having a little dizzy spell," was afraid of the height, and said she was afraid she was "going to faint. . . ." Thereafter, according to Ryan, Ditzler's "ability to walk without frequent rest stops was steadily deteriorating."

[¶ 44] Ryan and Ditzler became delayed when Ditzler dismounted her mule and was unable to remount near a creek crossing. Billings went back to the location. Based on the following testimony, Billings clearly recognized that at this point, Ditzler's condition required his continued, personal attention and that he remain in close proximity to her. Ryan testified that Billings asked "what the difficulties were," and assured Ditzler that Billings would check on her, "keep an eye on her," warn her in advance of "any dangerous parts of the descent" and help her "mount and dismount." Ditzler testified that Billings asked what was "going on," she told him that she needed to eat, sit and rest for a few minutes, was having trouble with the switchbacks, it was becoming a bit "too much," and she asked Billings how the trail was ahead. According to Ditzler, Billings replied that the trail was rough in places but not to worry because he "would come back and help me get over those or at least come back and tell me where those areas were" and not to worry, all Ditzler had to do was "holler" and Billings would be "right there." Billings testified that he addressed, or attempted to address, Ditzler's food and water needs. He told Ditzler to "go at the speed you can," Ryan and D'Amico were with her, but that Billings would "come back and check on her." He further stated that he needed to "get this show on the road" because the mules could not be "tied up forever" and he could not "hardly stop." According to Ryan, Billings

never asked Ryan to stay with Ditzler or assist her on the trail.

[¶ 45] At this point, Ryan estimated that he was eight miles from the trailhead; Billings estimated it was between four-and-one-half to five miles from the trailhead. Ditzler thought it was about 1:00 p.m. or 2:00 p.m., Ryan stated that he last saw Billings about "2:30, 3:00 in the afternoon," and Billings estimated the time to be between 3:30 p.m. and 4:00 p.m. . . . . Billings stated that when he ultimately separated from Ryan and Ditzler, it was a little over two hours from the trailhead. Billings returned to the mule pack string and resumed down the trail with Roderick Ryan, Hillary Ryan, and Brian McCabe, leaving Ditzler with Eric Ryan and D'Amico.[21] Ryan and Ditzler testified that they never saw Billings again until they reached the trailhead.

[¶ 46] According to Billings, he got to the top of some switchbacks on the trail ten minutes after his conversation with Ditzler and couldn't see Ryan and Ditzler. Billings stated that Brian McCabe told him that he didn't see Ryan, Ditzler, and D'Amico "back there" and McCabe "didn't like that." Billings also "did not like that." However, the mules in Billings' pack string began to "dance around and were pushing on each other and jamming a little bit," consistent with Billings' own testimony as to what he would expect from a pack string of mules as they proceeded closer to the trailhead, and Billings decided he "had to do something about this" and proceeded down the trail. Billings had "to keep moving" to prevent a problem and could not stop easily or "for any length of time" between that point and the trailhead due to the terrain. He would "be heading for disaster if [he] tied them up at that point and then spent anything more than two or three minutes away from them." While Billings was not "totally happy" about this, he decided it made "sense that maybe we could preclude 12 other problems from beginning to surface in addition to [Ditzler's] problem." Billings felt "somewhat good"

---

**21.** Billings stated that Brian McCabe traveled with him ahead of the others but by the time the respective parties reached the trailhead, it ap-

pears that McCabe arrived just slightly ahead of Ryan and Ditzler.

that Ryan and D'Amico remained with Ditzler in case "something went and got worse."

[¶ 47] Ditzler could not remount her mule and walked the remaining distance to the trailhead. At about 5:30 p.m. or 6:00 p.m., Ditzler crossed a stream, "soaking her boots and jeans to the knees." Ditzler, who was overweight or "heavy," was tired, cold, it had "started to snow a little bit," and Ryan "knew that the temperature would drop after dark." Ditzler remained increasingly tearful, fearful and fatigued, and Ryan was "very concerned" that she "was a candidate for hypothermia." Ditzler would require frequent rest stops, would need to be coaxed a hundred yards at a time, sobbed, and exhibited signs of mental confusion.

[¶ 48] Billings arrived at the trailhead twenty minutes before dark. He "figured" that Ditzler was "maybe 45 minutes, an hour" behind him, although he had not seen her since shortly after their prior conversation on the trail. Instead of immediately returning to the trail to check on, and assist, Ditzler, Billings merely left his horse saddled in case Ryan and Ditzler did not arrive within his arbitrary time estimate, and "started getting packs undone and things put away. I wanted to be ready when the other group got out so that they could just get to town." Ryan indicated in a written statement that he and Ditzler reached the trailhead at about 7:45 p.m. He testified that they reached the trailhead at about 7:00 p.m. or 7:15 p.m. and that his brothers told him Billings had been there for at least two hours. Ditzler was "not real sure," but testified that they reached the trailhead "around eight o'clock." Billings estimated that they reached the trailhead forty-five minutes to an hour after Billings had arrived at the trailhead, or "about the time I expected them." Billings stated that he could see the party coming down the trail for some distance before they actually reached the trailhead. Billings and Ryan then became involved in a verbal, and to some degree, a physical, confrontation. According to Billings, he did not believe Ditzler was hypothermic when she arrived at the trailhead.

[¶ 49] The Board found as follows:

4. On or about October 10, 1997, as his client, Sandra Ditzler, was making her way out of the wilderness, Billings abandoned Ditzler when she was experiencing difficulty with the return to the wilderness trailhead.

A. Ditzler became exhausted and had difficulty mounting her mule as she made her way back to the trailhead....

B. Billings knew Ditzler was experiencing problems and assured her he would return for her or would at least be within yelling distance.... Billings told Ditzler he "would be checking on her throughout the descent", "would warn her of any dangerous parts" and "would keep and eye on her." ... Billings admitted he left Ditzler to move his pack down the trailhead and never returned for them.... He also acknowledged he knew Ditzler was experiencing some problems in that she was having "a little dizzy spell" and was possibly suffering from "vertigo".... Billings told Ditzler, "go at the speed you can" and assured her [Eric] Ryan and her husband would be there to help her....

C. Billings left Ditzler and the rest of his hunting party around 2:30 or 3:00 p.m.... Ditzler did not see Billings again until reaching the trailhead at approximately 7:00 or 7:45 p.m. that evening....

D. After Billings left Ditzler, her mule became increasingly difficult to handle, and Ditzler became "tearful" and "fearful".... Ditzler was "wearing low-cut hiking boots and blue jeans" and was "soaked from her knees down" in low temperatures and falling snow.... She was suffering from fatigue and that "(a)t ... several points, she asked to be left on the trail" and "had the idea that if (Ryan) rode on out (he'd) be able to get a truck and come up and get her with a truck" which was "(a)n absurd notion to anyone who has seen that trail." ... Ditzler had to be coaxed out of the

wilderness by another hunter, Mr. Ryan....

E. Ditzler did not see Billings again until she returned to the trailhead with the assistance of two other hunters; several hours after Billings left her in the mountains....

F. Billings prioritized his mules over the wellbeing and safety of his client, Sandra Ditzler....

G. Billings contemplated the seriousness of leaving his client, and chose to leave Ditzler behind with Mr. Ryan and Mr. [D'Amico].... Despite the fact he acknowledged that Ditzler was dizzy and assured her he would come back and check on her, he decided to leave Ditzler's wellbeing to the survival skills of his other clients....

H. Billings' rationale for leaving his hunters was not a justification for abandoning Ditzler in a wilderness area. The fact that Billings contemplated Mr. Ryan's survival skills and felt "somewhat good" about Ditzler's husband and Eric Ryan being with Ditzler if "something went and got worse" indicates Billings knew and contemplated potential dangers to his client, and chose to abandon her in spite of those potential risks.... Consequently, Billings willfully endangered Ditzler's health and safety by abandoning her in the wilderness on or about October 10, 1997.

The Board concluded, as a matter of law, that Billings willfully endangered Ditzler's health and safety by leaving or abandoning Ditzler in the wilderness in order to get his livestock back to the trailhead and never returning to check on her well-being or progress, in violation of Wyo. Stat. Ann. § 23–2–416(a)(ix) and (x) and Chapter 3, Sections 1(o) and (t) of the Board's rules.[22] We have previously set forth the language contained in these provisions, as well as relevant definitions of its terms.

[¶ 50] Billings first argues that the Board could not properly conclude that Billings willfully endangered Ditzler absent expert testimony establishing a standard of care and Billings' breach of that standard of care. Billings asserts that he exercised his professional judgment on the trail due to difficulties with his pack string of mules, and the Board essentially concluded that Billings' professional judgment fell below some industry standard. He contends that the Board therefore subjectively evaluated Billings' judgment without the "guidance of expert opinion, or any regulations in place which set a standard related to the 'abandonment' " of Ditzler.

[¶ 51] Billings advanced a similar argument in *Billings I* regarding the Board's finding that Billings willfully endangered the health and safety of Dan Nutsch by "permitting him to be injured while caring for livestock 'which should have been properly cared for by' " Billings' employees. *Billings I,* 2001 WY 81, ¶ 17, 30 P.3d at 566. We commented on that issue, in pertinent part, as follows:

Obviously, clients on an outfitted hunting trip must participate in the adventure. The extent of such participation, however, is not something this court has within its knowledge.

Perhaps the Board, which consists of a number of persons who would undoubtedly qualify as experts in the field of outfitting, used its expertise to determine that Billings' actions failed to meet his duty of care as an outfitter. However, our decision in *Devous v. State Board of Medical Examiners,* 845 P.2d 408, 418 (Wyo.1993), does not permit the Board to do that:

"Turning then to the appeal of the Board with respect to the decision of the district court to set aside certain statuto-

---

22. In a footnote, Billings argues that the Act only applies to "situations where a non-resident 'hunter' is hunting big or trophy game animals," and therefore does not apply to Ditzler's situation because she was not a hunter on the trip. Billings does not dispute that he met the definition of an "outfitter" pursuant to Wyo. Stat. Ann. § 23–2–406(a)(ii) (LexisNexis 2003) or that the Board licensed him as an outfitter pursuant to the Act. Wyo. Stat. Ann. § 23–2–416(a) grants the Board the authority to suspend or revoke an outfitter's license issued under the Act for willfully endangering the health and safety of *any person.* Chapter 3, Section 1(o) of the Board's rules states that a licensee shall not willfully endanger the health and safety of the *public.*

ry grounds for failure of substantial evidence, we affirm the district court in that regard. The crux of the issue is whether the record must include expert testimony with respect to those statutory grounds, or whether we must acknowledge and accept the expertise of the Board members in establishing standards that demonstrate infringement of the statute. There was no expert testimony offered at the hearing to establish standards with respect to these statutory grounds. If judicial review has any purpose, it must be exercised by objectively evaluating evidence in the record. There is no way that a judicial review could reach the subjective determination of standards by individual members of the Board...."

In this case, if the Board intends to rely on a finding that Billings' conduct regarding the mule kick incident fell below the standard of care for those in his industry, the Board should rely on expert testimony in making such a finding.... [A]bsent any indication in its findings that the Board is relying on expert testimony, we conclude that the finding is insufficient to permit review.

*Id.*, 2001 WY 81, ¶¶ 17–18, 30 P.3d at 566–67 (footnote omitted).

[¶ 52] We find that the record is sufficient in the instant case, without additional expert testimony, to allow us objectively to evaluate the evidence, the Board's findings, and the applicable statutory language. While expert testimony might have assisted the Board, the concerns we referenced in *Billings I* do not exist with respect to the Ditzler violation, which violation arises in a different context. Neither the nature of the violation, nor the facts underlying it, involves subject matter "not within our knowledge" or requiring additional expert testimony. The state of the record is such that in reviewing the issue, we are not required merely to accept the Board's subjective expertise for a standard that demonstrates infringement of the statute. Contrary to Billings' argument, it does not appear that the Board's use of the term "abandonment" was for purposes of establishing a formal standard of care, but

was the Board's factual characterization of Billings' actions.

[¶ 53] Billings also argues that the evidence was insufficient to establish that he willfully endangered Ditzler's health and safety. Billings contends that he did not "abandon" Ditzler, and his decision to proceed down the trail did not "increase the danger or peril" to Ditzler. We conclude that the Board could properly have found that Billings willfully endangered Ditzler's health and safety from the totality of the evidence, especially considering the evidence as to: (1) Billings' knowledge prior to, and throughout, the incident, including his knowledge in deciding to take the entire group and the mule pack string to the trailhead by himself, his knowledge of Ditzler prior to departing on the trail, his knowledge as to the nature of the trail and the nature of the livestock, etc.; (2) Ditzler's difficulties and condition as the group navigated the trail; (3) Billings' resulting response as to what he felt was required under the circumstances; (4) Billings' actions in leaving Ditzler on the trail; (5) the terrain, the time of day, and the weather; (6) the subsequent deterioration in Ditzler's condition; and (7) Billings' actions upon arriving at the trail head *vis a vis* the surrounding circumstances. "We do not substitute our judgment on the facts for that of the agency if [sufficient] evidence exists, even though different conclusions might be drawn from that evidence." *Gray v. Wyoming State Bd. of Equalization*, 896 P.2d 1347, 1348 (Wyo.1995).

### License Revocation as Sanction for Violations

[¶ 54] Billings asserts that even if there was sufficient evidence for the Board to find that he committed these violations, the Board failed adequately to explain why it revoked his outfitter's license, as opposed to some other sanction, and acted arbitrarily by failing to link its findings and conclusions to its ultimate decision regarding an appropriate sanction and to Billings' general fitness to be a licensed outfitter. The Board argues that its findings were "detailed and thorough," and sufficiently explained why the

violations were "adequate grounds" to revoke Billings' outfitter's license.

[¶ 55] In reviewing the merits of a sanction imposed by an agency, several courts have defined the scope of our review as one in which we will not overturn an agency's choice of sanction unless we find that the sanction is unwarranted in law or without justification in fact. *See, for example, Butz v. Glover Livestock Commission Co., Inc.,* 411 U.S. 182, 185–89, 93 S.Ct. 1455, 1458–59, 36 L.Ed.2d 142 (1973); *Norinsberg Corp. v. United States Dept. of Agriculture,* 47 F.3d 1224, 1228 (D.C.Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995); *Chapman v. United States, Dept. of Health & Human Services,* 821 F.2d 523, 529 (10th Cir.1987); *Larsen v. Commission on Medical Competency,* 1998 ND 193, 585 N.W.2d 801, 808 (N.D.1998); and *Johnson v. Board of Governors of Registered Dentists of State of Okl.,* 1996 OK 41, 913 P.2d 1339, 1347 (Okl.1996). The Board found that the violations Billings committed were, "separately and/or collectively, ... adequate grounds to revoke" his outfitter's license.

[¶ 56] The Board's decision to revoke Billings' outfitter's license clearly was warranted in law because Wyo. Stat. Ann. § 23–2–416(a)(iv) and (ix) grant the Board the authority to "suspend or revoke a license" for a "[v]iolation of any significant federal or state law or related regulations pertaining to wildlife, game and fish" and for "[w]illfully endangering the health and safety of any person[.]"

[¶ 57] We further find that the facts supporting the imposition of a license revocation are apparent from the record before us. Billings' argument tracks with our recent holding that the record must contain sufficient factual findings for this Court to understand the basis for an agency's conclusion that a licensee's violations warranted a license revocation rather than a license suspension or some other lesser sanction—the agency's findings must be sufficient for this Court to follow the agency's reasoning from the evidentiary facts on record to its eventual legal conclusions. *Legarda,* 2003 WY 130, ¶ 12, 77 P.3d at 712–13.

[¶ 58] In *Legarda,* 2003 WY 130, ¶¶ 3–4, 77 P.3d at 710, the Department of Transportation (DOT) instituted license revocation proceedings against Legarda, doing business as Laris Auto Sales, for violating several state statutes and the department's rules and regulations. Following a contested case hearing, the Office of Administrative Hearings (OAH) concluded that Legarda violated two statutes and one department rule. *Id.,* 2003 WY 130, ¶ 6, 77 P.3d at 710. "Based upon these violations and DOT's discretion to revoke licenses when violations are found, OAH upheld DOT's proposed revocation of Laris' dealer license and bond forfeiture." *Id.* Legarda appealed that determination to this Court. On appeal, we concluded that

the OAH order does not contain sufficient factual findings to enable this Court to understand the basis for the hearing examiner's conclusion that Laris' violations warranted revocation of its dealership license rather than suspension or some other lesser punishment. That is, we hold the record does not contain such factual findings as would permit us to follow the agency's reasoning from the evidentiary facts on record to its eventual legal conclusions. *Newman [v. State ex rel. Wyoming Workers' Safety and Compensation Div.],* 2002 WY 91, ¶ 16, 49 P.3d 163 [ (Wyo.2002) ].

. . .

In the present case, it is clear from the findings of fact in the order that OAH found Laris violated certain DOT statutes and regulations. While we do not question the validity of those findings, we do observe their relatively minor nature. Nothing in the record indicates Laris had a history of such violations despite its many years of operation in Fremont County. While the violations may have resulted in minor inconveniences to those who purchased automobiles from Laris, no one alleged Laris was acting fraudulently or intentionally trying to take advantage of its customers. Following the compliance review, a follow-up inspection revealed no violations. Yet, DOT proposed revoking the license and forfeiting the bond, thus putting Laris out of business permanently. What is not clear from the findings, and what is not apparent anywhere in the rec-

ord before us, is the reason for the decision to revoke Laris' license rather than suspend or take some other less drastic action to obtain compliance. There is quite simply nothing in the record indicating what facts supported the imposition of the most severe penalty available. Under these circumstances, the OAH order cannot stand absent further findings explaining the reasons why revocation, rather than suspension or some other lesser penalty, is warranted. *Scott [v. McTiernan],* 974 P.2d 966 [ (Wyo.1999) ]; *Billings,* 2001 WY 81, ¶ 13, 30 P.3d 557.

*Legarda,* 2003 WY 130, ¶¶ 12, 14, 77 P.3d at 712–13.

 [¶ 59] It is certainly advisable that, when imposing a sanction, an agency take special care to ensure that its findings establish a clear nexus between the evidentiary facts and the agency's legal conclusion. However, the circumstances underlying our decision in *Legarda* are distinguishable from those in the instant case. In *Legarda,* we emphasized the "relatively minor nature" of Legarda's violations, which violations "may" have resulted in "minor inconveniences" to Legarda's clients but did not involve fraudulent conduct or an intentional attempt to take advantage of a client. *Id.,* 2003 WY 130, ¶ 14, 77 P.3d at 713. In the instant case, Billings' conduct willfully endangered a client's health and safety and violated a significant federal regulation relating to wildlife, the stated goal of which regulation is "minimizing grizzly/human encounters and thereby providing for user safety" and grizzly bear protection.

 [¶ 60] Billings also claims that, based on the dispositions of other cases before the Board, he was subjected to arbitrary, selective and unequal treatment by the Board in revoking his outfitter's license, as opposed to imposing a lesser sanction. Billings filed a motion in the district court to supplement the administrative record with pertinent portions of the Board's meeting minutes for a five-year period. Billings offered the meeting minutes to demonstrate that the Board,

> in nearly every instance when an outfitter or guide applies for the issuance or renew-

al of a license and has violated a law or regulation pertaining to wildlife, game or fish or has been convicted of a felony, usually admonishes the applicant and either grants the license as requested or grants a conditional license, but almost never denies a license.

It does not appear that the district court ruled on Billings' motion to supplement the record. Billings does not cite to any pertinent legal authority in advancing this argument. Notwithstanding the district court's failure to rule on Billings' motion to supplement the record, the "employment of a sanction within the authority of an administrative agency is ... not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases" and "mere unevenness in the application of the sanction does not render its application in a particular case 'unwarranted in law.' " *Butz,* 411 U.S. at 187–88, 93 S.Ct. 1455.

## DECLARATORY JUDGMENT ISSUES

[¶ 61] Billings filed a Complaint for Declaratory Judgment pursuant to the Uniform Declaratory Judgments Act (Wyo. Stat. Ann. §§ 1–37–101 to 1–37–115 (LexisNexis 2003)) within the same document as his Petition for Review of Agency Action. In that complaint, he set forth nine counts alleging constitutional infirmities concerning various state statutes and rules promulgated by the Board, and that the Board lacked jurisdiction to adjudicate particular issues. The district court found that Wyo. Stat. Ann. § 23–2–416(a)(v) was unconstitutionally vague, but otherwise rejected Billings' declaratory judgment allegations. The Board did not cross-appeal the district court's ruling.

 [¶ 62] In his appellate brief, Billings begins his discussion of the declaratory judgment issues by summarizing each of the nine counts contained in the original complaint. These summaries are not accompanied by any citations to pertinent legal authority. "We have consistently held that we will not consider claims unsupported by cogent argument or pertinent authority." *Barkell v. State,* 2002 WY 153, ¶ 32, 55 P.3d 1239, 1245 (Wyo.2002).

[¶ 63] Several more specific arguments follow these summaries. Billings first contends that Wyo. Stat. Ann. § 23–2–416(a)(v), which statute provides that the Board may suspend or revoke a license for "[u]nethical or dishonorable conduct," is unconstitutionally overbroad and vague. The Board utilized this statutory provision in finding that Billings acted "unethically and dishonorably" in: (1) calling a former client a "son of a bitch" and threatening the client with physical violence by expressing a desire to settle their dispute "face to face" and "with our fists" in an October 29, 1997, letter; and (2) challenging Eric Ryan to a fight and shoving him when Ryan and Ditzler returned to the trailhead in October 1997.

[¶ 64] Billings advances this argument on appeal to preserve the issue in light of a potential "ambiguity" in the district court's orders. In its August 15, 2002, Order On Declaratory Judgment, the district court found that the statutory language "unethical or dishonorable conduct" was "unconstitutionally vague." The district court otherwise rejected Billings' declaratory judgment arguments. In its November 27, 2002, Findings and Order Affirming Order of the Board, the district court referred to its prior determination that the statutory language was unconstitutional and proceeded to consider the merits of the issues Billings raised in his petition for review. The district court ultimately ordered that the Board be "affirmed and for the reasons given in the August 15, 2002 order of this Court, the declaratory judgment action is dismissed." Although this quoted language is imprecise, it remains clear from the totality of both the district court's orders that the district court did not intend to deviate from, or alter, its finding that Wyo. Stat. Ann. § 23–2–416(a)(v) was unconstitutionally vague. We need not consider the merits of the issue on appeal because the Board did not cross-appeal the district court's ruling on the issue.

[¶ 65] Billings next asserts that Wyo. Stat. Ann. § 23–2–416(a)(iv), which statute allows the Board to suspend or revoke a license for a "[v]iolation of any significant federal or state law or related regulations pertaining to wildlife, game and fish," is unconstitutionally vague on its face. He contends that the provision does not sufficiently define the terms "significant laws or regulations" or "violation." Billings also argues generally that "willful endangerment," as utilized by the Board in the instant case, does not establish an adequate standard for measuring one's conduct, although he does not cite any pertinent legal authority in advancing this argument.

[¶ 66] We addressed these arguments in our prior opinion in this matter:

> Despite Billings' complaints that the Board has provided no definition of which regulations will be considered significant, that is not a concern in this case....
>
> . . .
>
> Billings also complains that certain statutory provisions require definition. He complains that the Board must define "willfully endangering" found in § 23–2–416(a)(ix). We are of the opinion that those terms are not so technical that further definition is required....
>
> Billings also complains that the Board must define the term "violation" found in § 23–2–416(a)(iv). However, we agree with the State that this term needs no further definition. Violation in this context simply means non-compliance with the law or regulation in question.

*Billings I*, 2001 WY 81, ¶¶ 27, 34–35, 30 P.3d at 569, 571.

[¶ 67] Billings argues that Chapter 3, Section 1(n) of the Board's rules is similarly vague. That provision states that a licensee shall

> maintain neat, orderly and sanitary camps at all times and shall provide clean, fresh drinking water, protect all food from contamination and dispose of all garbage, debris and human waste. Livestock facilities shall be separate from camp facilities. Streams shall be protected from contamination.

Billings' three-paragraph argument (primarily in the form of a series of questions based on the rule's language) on this issue does not constitute cogent argument, and Billings does not cite to any pertinent legal authority in advancing this particular argument.

[¶ 68] Billings' final argument is that several subsections of a Code of Ethics (Chapter 3, Section 2 of the Board's rules) the Board promulgated and filed of record in 2001 (after the contested case hearing and our prior opinion in this matter) are unconstitutionally vague.[23] Billings challenges the "prospective application of these rules" because a future violation "may" result in the denial, suspension or revocation of his outfitter's license, and his expected future business "will be" affected by the rules. He also expresses "concern" that the new rules "will serve as a convenient vehicle for retribution for the lengthy and expensive battle that Mr. Billings has mounted against the Board." The Board counters that Billings lacks standing to challenge the new rules and that the rules are not constitutionally infirm.[24]

[¶ 69] " 'Standing is a concept utilized to determine if a party is sufficiently affected to insure that a justiciable controversy is presented to the court.' " *Memorial Hosp. of Laramie County v. Department of Revenue and Taxation of State of Wyo.*, 770 P.2d 223, 226 (Wyo.1989) (*quoting Washakie County School Dist. No. One v. Herschler*, 606 P.2d 310, 316 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980)). A party has standing "only if he has a tangible and legally protectible interest at stake in the litigation; his interest must be injured or threatened with injury by the administrative action of which he complains." *Memorial Hosp. of Laramie County*, 770 P.2d at 226. Further,

> [d]eclaratory relief should be liberally administered if the elements of a justiciable controversy exist to give the trial court jurisdiction. *Brimmer v. Thomson,* 521 P.2d 574, 577 (Wyo.1974). For that controversy to exist, a genuine right or interest must be at issue between adversarial parties, and the trial court must be able to make an effective judgment which will finally determine the rights of the parties. *Id.* at 578. Even these prerequisites, however, may properly be avoided or relaxed

when matters of great public interest or importance are presented to the trial court.

*Memorial Hosp. of Laramie County,* 770 P.2d at 226. The Declaratory Judgments Act " 'gives the courts no power to determine future rights or anticipated disputes or controversies.' " *State Dept. of Revenue and Taxation v. Pacificorp,* 872 P.2d 1163, 1169 (Wyo.1994) (*quoting White v. Board of Land Com'rs,* 595 P.2d 76, 79 (Wyo.1979)).

[¶ 70] In *Pacificorp,* 872 P.2d at 1164–65, taxpayers sought a declaratory judgment regarding rules the State Department of Revenue and Taxation promulgated "pertaining to the ad valorem tax exemption for pollution control property, claiming that the State exceeded its statutory authority when it promulgated the rules." The rules took effect in February 1992, and the taxpayers filed for declaratory relief in June 1992. *Id.* The taxpayers acknowledged that the tax exemption issues were " 'not the subject of a direct dispute in the 1992 valuation determination,' " but argued that the " 'threat of harm and improper taxation [was] present and real' " and that "a justiciable controversy existed because they may apply in the future for the exemption . . . and the State may deny the request." *Id.* at 1168. We concluded that no justiciable controversy existed, stating the following:

> The taxpayers contend that the threat of harm and improper taxation was present and real. We disagree.
>
> The taxpayers did not present any evidence which indicated that their interests had actually been injured or that an imminent threat of such an injury existed. If we were to rule on the validity of the [rule's] language, our ruling would not effectively operate to terminate an actual controversy.
>
> The taxpayers rely on *Memorial Hospital of Laramie County* as authority for their argument that a justiciable controversy existed in this case. In *Memorial Hospital of Laramie County,* the contro-

---

23. Interestingly, several sections of the Code of Ethics Billings discusses in his principal appellate brief are not specifically referenced in his Complaint for Declaratory Judgment.

24. The Board does not argue that Billings lacks standing as to any other issue.

versy centered around the sales and use taxation of materials which were used in the construction of an addition to a hospital. The Department of Revenue and Taxation notified a subcontractor who supplied materials "through a direct contract with the hospital while providing labor relating to those materials through a separate labor subcontract with [the construction manager]" that the materials were subject to taxation. [*Memorial Hospital of Laramie County*,] 770 P.2d at 225. The hospital filed a claim for declaratory and injunctive relief, alleging that its tax-exempt status precluded taxation of the materials. *Id.* It also paid, under protest, the taxes which were assessed against the subcontractor. Although the hospital may not have been immediately obligated to pay the tax, the Court held that a justiciable controversy existed because "the injury [was] sufficiently imminent as to warrant judicial consideration." 770 P.2d at 227.

The *Memorial Hospital of Laramie County* situation is different from the situation in the case at bar. In that case, the Department of Revenue and Taxation had already notified the subcontractor that the materials were subject to taxation. Even if, as the Court suggested, the hospital may not have been immediately obligated to pay the tax, the parties had taken certain material steps which presented a real and imminent threat to the hospital's interest.

In this case, the State had neither made nor threatened to make a demand for payment of a tax on uncapitalized property. In fact, the taxpayers concede that the [rule's] language "was not the subject of a direct dispute in the 1992 valuation determination." The threat was not real at that point.

This case did not present a matter of great public interest or importance and, therefore, did not warrant relaxation of the justiciability requirement. This Court stated in *Brimmer* that the great public interest or importance exception to the justiciability requirement "must be applied with caution and its exercise must be a matter where strict standards are applied." 521 P.2d at 578. Since an exemption for

uncapitalized property was not requested or denied, our refusal to entertain this action will not put the taxed entities or the public coffers at risk.

*Pacificorp*, 872 P.2d at 1169 (footnote omitted).

[¶ 71] We similarly conclude in the instant case that no justiciable controversy exists as to the Board's Code of Ethics at this time because any decision regarding the validity of certain sections of the new rules would not effectively operate to terminate an actual controversy. Billings was not subject to the new rules at the time he filed for declaratory relief, and we have upheld the Board's revocation of Billings' outfitter's license. Further, the only administrative action at issue is the Board's issuance of the new rules. The Board promulgated the new rules well after this matter commenced, the Board did not utilize the new rules as a basis to sanction Billings, and there is no evidence constituting a real and imminent threat of any such action. Billings admittedly challenges the "prospective" application of the new rules which "may" result in some future action by the Board and Billings does not argue that this case presents a matter of great public interest or importance. Such a challenge does not meet our criteria for standing, especially considering our decision in *Pacificorp*.

## CONCLUSION

[¶ 72] The evidence was sufficient to support the Board's findings that Billings violated a significant federal regulation pertaining to wildlife, game and fish, that Billings willfully endangered the health and safety of Sandra Ditzler, and that Billings' outfitter's license should therefore be revoked. Our conclusion that insufficient evidence existed to support the Board's finding that Billings willfully endangered the health and safety of consumers of the lower camp's water supply, maintained an unsanitary camp, failed to keep livestock facilities separate from camp facilities, and failed to protect a stream from contamination does not affect the result or ultimate affirmance of this case. Billings' declaratory judgment arguments were either

resolved by the district court, resolved in *Billings I*, not supported by citation to pertinent legal authority, or did not present a justiciable controversy. We affirm.